STATE FARM LIFE INSURANCE COMPANY v.
SPIDEL ET UX.

[No. 30,700. Filed December 15, 1964. Rehearing
Denied April 29, 1965.]

*Edmond J. Leeney, John E. Leeney,* and *Galvin, Galvin & Leeney,* of counsel, of Hammond, for appellant.

*M. Elliot Belshaw, James Kenner Whitaker* and *Bomberger, Wilson & Belshaw,* of counsel, of Hammond, for appellees.

ACHOR, J.—The action is before this court on petition to transfer from the Appellate Court under Supreme Court Rule 2-23. [See: *State Farm Life Insurance Company* v. *Spidel* (1964), 194 N. E. 2d 96, for Appellate Court opinion.]

This was an action by plaintiffs-appellees against defendant-appellant to recover the proceeds of a life insurance policy issued by the appellant on the life of appellees' son, Kenneth D. Spidel. The issues upon which the case was tried were formed by appellees' second paragraph of answer which alleged that on May 26, 1958, appellant issued a life insurance policy to said Kenneth D. Spidel in the sum of $10,000, and that one of the conditions of said policy was that suicide within two years of the date of issuance of said policy was a risk not assumed under the policy, and that on August 4, 1959, said Kenneth D. Spidel committed suicide.

The grounds asserted as cause for new trial and assigned as error on appeal are as follows:

1. That the verdict is not sustained by sufficient evidence.

2. That the decision is contrary to law.

3. That the court erred in overruling defendant-appellant's motion for a directed verdict.

Before discussing the evidence and the inferences drawn therefrom which support the verdict of the jury, we give consideration to the applicable law as related to the above assigned errors.

1. The contention that the verdict is not sustained by sufficient evidence presents no question to this court

for review on appeal. Appellant alleged the affirmative defense of suicide in paragraph 2 of its answer and had the burden of proving the same. The jury found against appellant upon this issue and, as the court said in *Metrailer et al.* v. *Bishop et al.* (1959), 130 Ind. App. 77, 79, 162 N. E. 2d 94:

" . . . 'As the finding was negative to appellants who had the burden of proof, they cannot challenge the insufficiency of the evidence to sustain the finding [citing cases]."

This general rule is supported by *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 528, 104 N. E. 2d 669, and *Von Cline* v. *Cline, Administratrix, etc.* (1960), 130 Ind. App. 473, 475, 165 N. E. 2d 608.

2. As to the contention that the verdict is contrary to law, the rule as announced by this court in *Hinds, Executor Etc.* v. *McNair, et al.* (1956), 235 Ind. 34, 41, 129 N. E. 2d 553, is:

"If the undisputed evidence entitles the one who has the burden of proof to a verdict which has been denied him, such verdict is contrary to law. To determine this question we may consider only the evidence most favorable to the appellees, together with all reasonable inferences which may be drawn therefrom.

'It is only where the evidence is without conflict and can lead to but one conclusion, and the trial court has reached an opposite conclusion, that the decision of the trial court will be set aside on the ground that it is contrary to law," See: *Metrailer et al* v. *Bishop et al., supra.*

3. In *Whitaker, Admr.* v. *Borntrager* (1954), 233 Ind. 678, 680-681, 122 N. E. 2d 734, the court gave this answer as to when a trial court may properly give a jury a peremptory instruction to find for the defendant:

" 'When there is a total absence of evidence or legitimate inference in favor of the plaintiff upon as essential issue; or where the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant. [Citing cases.]

' . . . [T]he court will not weigh the conflicting evidence or inferences but will consider only the evidence and inferences that are most favorable to the party against whom the motion for a peremptory verdict is directed. [Citing cases.]

'In determining whether a peremptory instruction should be given the court must accept as true all facts which the evidence tends to prove and draw, against the party requesting such instruction, all inferences which the jury might reasonably draw.' " [Citing cases.] See also: *Garr* v. *Blissmer et al.* (1962), 132 Ind. App. 635. 177 N. E. 2d 913; *Huttinger* v. *G. C. Murphy Company* (1961), 131 Ind. App. 642, 172 N. E. 2d 74.

Thus, in determining whether the verdict is contrary to law and whether a verdict should have been directed for appellant, the tests and rules to be applied in deciding both questions are similar. Appellees are entitled to all reasonable inferences from the evidence in the record most favorable to them and, unless such evidence and inferences reasonably lead exclusively to the conclusion contended for by appellant and no other, the trial court should be affirmed in upholding the jury verdict.

With these rules in mind, we proceed to a recital of the evidence and consider this evidence and the inferences which support the verdict of the jury.

Kenneth D. Spidel was born in 1939 and was the son of appellees Kenneth W. and Reba Spidel. He graduated from high school in 1957, at which time he was in the top twenty of his class, and received a scholarship. He was an ambitious boy who worked on the outside while going to school; had always received high honors in school; was president of a high school fraternity; the leading student in his chemistry class, and president of

the youth group of the church that he and his parents attended.

He enlisted in the Army and later was sent to Hanau, Germany, where he was assigned as a military policeman to Company C of the 709th M. P. Battalion, eventually being promoted to P.F.C. At this time he was 20 years old, five feet, eleven inches tall and weighed about 180 pounds.

On August 3, 1959, at approximately 2:00 p.m., Kenneth Spidel and a roommate, Ulysses Hedrick, left the barracks and went to the town of Hanau to see about a temporary duty assignment for the next day in Frankfort, Germany. Thereafter they went to the American Star Bar in Hanau, started drinking beer, which drinking was continued in various taverns until about 8:30 p. m., when P.F.C. James L. King, a military policeman in Spidel's outfit on routine patrol, told them to return to the barracks.

Spidel returned, but later went back to Hanau and resumed drinking, and about 11:15 p. m. P.F.C. King, with his patrol partner Kunz, again saw Spidel, who was then heavily under the influence of alcohol. They took him back to his company in a patrol jeep.

Hedrick, Spidel's roommate, observed him in their room between 12 and 12:30 a. m., and Hedrick described him as "blind drunk or completely drunk," and stated that he fell out of bed several times between 12:30 and 1:00 o'clock and had to be helped back into bed. At about 4:30 a. m. Hedrick awakened Spidel and asked him if he wanted to go to "chow." Spidel declined but asked to borrow a sheet of paper and a pen, "to get his story straight," and then asked his roommate to go down to the charge of quarters room to find out what had been put in the register. Hedrick did not return with the requested information. Soon after Hedrick left, Spidel went down to the charge of quarters room

dressed in his underwear, looking tired, haggard and worried, and wanted to read the entry in the CQ log. He was very nervous and said he would get a 208 (dishonorable) discharge.

About a half hour later Spidel was seen fully dressed in proper uniform for going on duty in Frankfort, Germany. He was freshly shaven, his hair was neat and he appeared calm and asked for a cigarette.

Shortly thereafter Spidel went to the arms room and got a M-1 rifle and a .45 caliber pistol, which was regular equipment for military policemen. At that time he appeared "fairly happy . . . had a smile on his face, and he answered in a polite fashion, which was the way he was all the time."

At about 6:30 a. m. (about 15 minutes later), Ralph Register, another soldier, heard a shot. He went out in the hall and observed a bullet hole in the door to Spidel's room, a crack in the plaster across from the door, and an expended bullet, which he picked up. He went into Spidel's room and there found him on his bunk with a wound in his head. He then went to the charge quarters, reported the incident, and returned. Spidel was still alive, moving his arms and speaking incoherently. He observed a .45 caliber pistol lying on Spidel's throat and an Air Mail-type envelope with red and blue border lying on his chest. Spidel died from the bullet wound, the bullet entering his right temple and leaving the left temple. A witness who specialized in pathology testified that the gun was fired fairly close to the head. The contents of the envelope could only be described as a suicide note.

Obviously this evidence would have sustained a verdict for the appellant-defendant. The trial judge, sitting as a "thirteenth juror" at the motion for new trial, had not only the right but the obligation to weigh the evidence and determine whether

in the minds of reasonable men a contrary verdict should have been reached. *Novak, Admx., etc.* v. *Chi. & C. Dist. Tr. Co., et al.* (1956), 235 Ind. 489, 497, 135 N. E. 2d 1, 5; *Harmon* v. *Arthur* (1963), 135 Ind. App. 134, 192 N. E. 2d 498; *Bailey* v. *Kain* (1963), 135 Ind. App. 657, 192 N. E. 2d 486; *Topper* v. *Dunn* (1961), 132 Ind. App. 306, 177 N. E. 2d 382. However, the trial court having determined that issue adversely to the party having the burden of proof, the appellate tribunals of the state are not free to readjudicate the credibility of witnesses or to weigh the evidence. Rather, since the verdict was for the plaintiff-appellees, and since the appellant-defendant had the burden of proving death by suicide, this court on appeal may look to the evidence solely for the purpose of determining whether the evidence is without conflict and could lead solely to a conclusion contrary to that reached by the jury. As this court stated in the case of *Hinds, Executor Etc.* v. *McNair, et al., supra,* 235 Ind. 34, 41, 129 N. E. 2d 553:

> "If the undisputed evidence entitles the one who has the burden of proof to a verdict which has been denied him, such verdict is contrary to law. To determine this question we may consider only the evidence most favorable to the appellees, together with all reasonable inferences which may be drawn therefrom."

Evidence in support of the verdict and of the overruling of the motion for new trial, on the ground that the verdict was contrary to law, consists primarily in the testimony of a Mr. Henderlong, who was an arms ballistic expert who testified extensively regarding the technical characteristics of the Colt .45 pistol, including such matters as the muzzle velocity and the foot pound pressure per inch produced by such weapons, and of the "most tremendous recoil actions" of such small arms. He also testified regarding the heat generated upon the slug projectile of such a weapon caused by

the burning gasses forcing it through the barrel and the subsequent additional friction caused by the projectile passing through air or other matter through which it passes. He testified that it was his opinion that "if the gun were held in such a position as to enable the man to pull the trigger himself, the recoil would have been so great because of the lack of strength in that position that the arm *would have thrown the gun upon the recoil.*" And, further, that "the muzzle blast from the muzzle of the gun would have, without a question, blown the envelope off the chest."

From the above evidence the jury could have reasonably inferred that Kenneth Spidel did not himself fire the weapon, because of the great likelihood that he would have lost control of the weapon on its recoil, and that it would not reasonably have fallen or been laid by him across his neck. Further, the jury could have inferred that by reason of the muzzle blast from the weapon the "suicide note" was not placed on his chest by Spidel himself, but by someone else, after the firing of the fatal shot. These inferences may be coupled with the failure of appellant's evidence to exclude the possibility of a second person having been in the room with Kenneth Spidel up to 35 or 40 seconds after the fatal shot. [According to the witness Henderlong, it would have required this period of time for the projectile to cool enough to be picked up in a naked hand.]

Other weak points in the evidence are, the lack of evidence that Spidel's fingerprints were on the gun; that the gun which fired the fatal shot was that which was released to Spidel. Under these circumstances some doubt can be said to exist as to whether the decedent met his death by his own hand. Certainly we cannot say that the evidence is without conflict and is susceptible of but one inference and that inference is in favor of the defendant-appellant.

Admittedly, the alternatives to suicide are accident or homicide and neither of these are supported by sufficient evidence to require an inference that the deceased met his death by either of said alternative methods. However, the appellees did not have the burden of affirmatively establishing such proof. In this case appellees had no burden of proof as to the cause of death, and, unless appellant's evidence is such that only one inference—that of suicide—was possible, the verdict in appellees' favor must be upheld.

Judgment affirmed.

Arterburn, C. J. & Landis, J., concur.

Jackson, J., concurs in result.

Myers, J., dissents, with opinion.

### DISSENT

MYERS, J.—I cannot agree with the majority opinion's conclusion that there was sufficient evidence from which the jury could have reasonably inferred that Kenneth D. Spidel did not himself fire the pistol and thus uphold the jury's verdict that he died by some other method than suicide.

There was evidence that the gun was held close to Spidel's temple and that the shot was fired accordingly. Spidel had previously gotten "blind" drunk the night before, had gotten up at 5:30 a.m. on August 4th and obtained from witness Hedrick a sheet of paper, a pen and a large business-type air mail-envelope. The envelope which was found on his chest containing the suicide note was the same type. Spidel had said he was in serious trouble and might go AWOL and was afraid of an undesirable discharge by the Army. Apparently, by around 6:00 o'clock, he had shaved and dressed and was almost serene in his manner as though he had found a solution to his problem. At 6:20 a.m. he

was dead from the shot. Previously, he had obtained a .45-caliber pistol without signing for it.

Witness Register testified that he was in the process of shaving, across the hall from Spidel's room. At 6:15 he heard a shot, and, upon going out into the hall, found the expended bullet which had gone through the door, falling on the floor in the hall. He kicked open the door to Spidel's room and found him lying in bed, still alive, with the pistol on his throat and the note on his chest. It was witness Hedrick who came up immediately thereafter and took the pistol off Spidel's throat and put it on a footlocker, together with the spent bullet.

This action in itself would have obliterated any finger prints on the pistol, including those of Spidel or some one else. This was factual evidence which was not disputed. The actions on the part of Spidel, plus the contents of the note, all of which are undisputed, are circumstantial evidence indicating suicide. There was absolutely no evidence that there was any one in the vicinity who entered Spidel's room and shot him. "If one side is supported by evidence, and the other is not, that side which is unsupported must fail." *Sovereign Camp, etc.* v. *Haller* (1900), 24 Ind. App. 108, 114, 56 N. E. 255, 257. From what appeared in the record, it was only pure speculation and guess-work, not based upon the factual evidence, which could have led the jury to believe that Spidel had not committed suicide.

The evidence upon which appellees rely was *opinion* evidence. It was based upon hypothetical questions placed to an expert in the field of firearms. He was not at the scene at the time of the shooting. He stated on *voir dire* examination that he had never seen a person after he had been shot in the head by a .45-caliber pistol, nor had he seen what reactions such a person would have had if he had been shot by a .45, where the bullet goes in the right temple and comes out the left temple.

He did not testify that the shot was not suicide. He merely stated that in his opinion, if the gun were held in such a position for the man to pull the trigger himself, the recoil would have been great and would probably have broken the man's wrist, and he said: "I say probably." He also said that the blast from the muzzle would have blown the envelope off the man's chest if there were one lying there.

This opinion evidence does not upset the factual evidence which can lead to the only logical inference that suicide was committed. Under Judge Achor's definition of what is contrary to law, the facts of this case fall right in with the definitions he has set forth in his opinion.

I think the Appellate Court's decision was the right one and that transfer should be denied.

NOTE—Reported in 202 N. E. 2d 886.