INDIANAPOLIS NEWSPAPERS, INC. *v.* FIELDS ET AL.

[No. 1067S96. Filed June 5, 1970. No petition for rehearing filed.]

*Thomas M. Scanlon, Raymond W. Gray, Jr.,* and *Barnes, Hickam, Pantzer & Boyd,* of counsel, all of Indianapolis, for appellant.

*Brunner, Brown & Brunner,* of Shelbyville, *Elmon M. Williams,* of Greenwood, and *Felson Bowman, Andrew Jacobs, Sr.,* of Indianapolis, for appellee.

Richard M. Givan, Judge, having disqualified himself from participating in this cause and the four remaining judges of this Court participating being equally divided, Norman F. Arterburn, Judge, and Donald H. Hunter, Chief Justice, are of the opinion that the decision of the trial court should be reversed, while Roger O. DeBruler, Judge, and Amos W. Jackson, Judge, are of the opinion that the decision of the trial court should be affirmed,

NOW THEREFORE, pursuant to Rule AP. 15(E), the judgment of the trial court is affirmed and the separate opinions of the participating judges herein are as follows:

Donald H. Hunter, Chief Justice.

SEPARATE OPINION

ARTERBURN, J.—This is an action for libel brought in forty-four paragraphs of complaint by the appellee, Robert H. Fields, Sheriff of Marion County, against the appellant, Indianapolis Newspapers, Inc., publisher of the Indianapolis Star, a daily newspaper published in Indianapolis, Indiana. The action is based upon newspaper articles and editorials, sixty-two in number, pertaining to the Marion County Sheriff's

department and jail supervision published on forty-four separate days during a period between October 27 and December 28, 1965. The jury returned a verdict for the appellee-sheriff for $60,000.00 on six of the paragraphs out of the forty-four.

The series of publications upon which the complaint is based was brought about when a newspaper reporter (Rick Johnson) in October, 1965, learned that two inmates (Elmer Reagan and Danner Crick) had died following beatings in the old Marion County jail the previous July. The story, when it broke, revealed as a fact that Elmer Reagan, age 50, was an alcoholic and had been confined in a basement cell in the jail in July. Following a beating, in which a number of his ribs were fractured, he was left lying naked in his own filth on the basement floor of the jail, without a bed, toilet facilities or running water. On July 14, 1965, he was admitted to the hospital in the condition described and died from pneumonia on August 7, 1965, as a result of this condition.

The newspaper article also revealed that another inmate, an alcoholic, Danner Crick, age 62, was found in practically the same condition in the jail with broken ribs and was taken to the hospital and died on July 14, 1965, as a result of such condition.

A deputy sheriff, one Cottey, is alleged to have tipped off the newspaper reporter Johnson that an inmate, Charles P. McAdams, had some information concerning the incidents involving brutality in the jail. Reporter Johnson interviewed McAdams, an inmate, and then took him before a Marion Criminal Court judge where he made a statement under oath before the deputy coroner, alleging that Reagan had been beaten by deputy sheriff King.

Following the statement taken by the deputy coroner, a grand jury investigation was called concerning conditions in the jail. The evidence shows that when Sheriff Fields learned of the McAdams statement through the prosecuting attorney's office he ordered his deputies to pick up McAdams, a former

inmate, to bring him before the grand jury. However, Mc-Adams was taken to the jail first, where he was interviewed by the sheriff and deputies. McAdams was then taken to the grand jury later that day in the custody of the sheriff's deputy and, immediately after his testimony, was returned to the jail. He was not released from custody until after he had made a statement repudiating his charge that he had seen a sheriff's deputy beat up Reagan. The evidence shows he was given a flask of whiskey when he left the jail.

The sheriff claimed that it was not his deputies but rather a mental patient, William A. Brown, who was guilty of the beating and the death of Reagan when the mental patient was placed in the same cell with Reagan. Brown was 27 years of age and a former mental patient in a Philadelphia hospital. He was charged with second degree murder of Reagan, arraigned and returned to the Marion County General Hospital for psychiatric treatment and observation. When tried he was found not guilty because of insanity.

The substance of appellee-sheriff's charge is that from the series of articles innuendoes may be drawn therefrom that he was:

(1) An accessory after the fact of the murder of Elmer Reagan and Danner Crick in that he attempted to protect his guilty deputies.

(2) Guilty of prosecuting an innocent man, William A. Brown, the mental patient, for murder.

(3) Guilty of intimidating a Grand Jury witness, Charles P. McAdams.

We point out that the publications did not flatly say "Sheriff Fields is an accessory to the murder of a prisoner by a deputy." The newspaper articles, however, reported that Mc-Adams had stated and accused deputy sheriff King of beating and murdering Elmer Reagan, and that McAdams had been picked up and interrogated by Sheriff Fields and his deputies before he made the repudiation.

There is no question that the evidence in this case shows a great deal of animosity and ill-will by the reporter Johnson towards Sheriff Fields because of controversies relating to the release of news connected with the Sheriff's department for some time past. The evidence shows threats by Johnson to "get the sheriff" and that he was an "S.B." It is also plain that the series of news items upon which the verdict is based were truthful except in a few details, that is, it is unquestioned that Reagan and Crick were severely beaten up, neglected and uncared for in the jail at the time stated in the newspaper articles and that they were found in filth, dying in the jail, and taken to the hospital where they did die; that someone was at fault, either another inmate or a member of the sheriff's department.

The story about the beating in jail and the deaths was not discovered until some months afterwards by the newspaper. It is uncontroverted that after the news stories broke, McAdams, the informant, was picked up by the sheriff's office and interrogated and a statement taken from him; that likewise Cottey, another deputy sheriff who, it was said, had tipped off reporter-Johnson was suspended and interrogated by the sheriff, and an affidavit taken from him in which he denied ever having informed Johnson of the facts. The real dispute is whether or not a deputy was guilty of the beatings, as stated in the newspaper articles and the inferences which reflect upon the sheriff. The series of articles dealt mainly with the activities of the sheriff's deputies. In a few instances Sheriff Fields' name was mentioned. It is argued by appellant that the innuendoes of ·wrongful acts that might be drawn as charged cannot be transmuted to the sheriff personally under the New York Times rule. *New York Times Co.* v. *Sullivan* (1964), 376 U. S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686.

Appellant contends that a great deal of evidence during the trial was admitted which was improper. The transcript in

this case is voluminous. It consists of eight volumes. It is pointed out that a great deal of this evidence goes to the question of falsity of statements made in the newspaper. The appellant contends that to admit such evidence without showing it came to the knowledge of the appellant is immensely prejudicial in a jury trial. The appellee, however, contends the court instructed the jury that as to the issue of malice, only that evidence of falsity of which appellant had pre-publication knowledge was to be considered. Appellant says that such a procedure results in practically "drowning" defendant and then attempting to revive him in the end by an instruction. *St. Amant* v. *Thompson* (1968), 390 U. S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262.

It is likewise argued in this case by the appellant that evidence of ill-will alone may not go to prove knowledge of falsity or reckless disregard of the truth. Appellee's burden of proving that publication was made with knowledge of falsity or with a reckless disregard for the truth cannot be satisfied solely on the basis of evidence of ill-will. Under the *New York Times* criteria, false statements made with ill-will are not actionable. There must still be proof of knowledge of falsity or reckless disregard of the truth.

The trial court's instruction number 30 contravenes this very principle. It stated:

"Evidence tending to establish that the defendant harbored ill-will toward plaintiff prior to the publications in question may be considered only on the issue of whether or not the defendant published the articles in question with knowledge of falsity or with reckless disregard whether they were false or not."

Under this instruction the jury might have based its finding of knowledge of falsity merely on proof of ill-will. In *Garrison* v. *Louisiana* (1964), 379 U. S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125 it was said:

"Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and ascertainment of the truth." See also *Rosenblatt* v. *Baer* (1966), 383 U. S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597; *Rose* v. *Koch* (1967), 278 Minn. 235, 154 N. W. 2d 409.

Another issue presented for our consideration is the contention that there is no proof of damages to the appellee-sheriff. The appellee put on witnesses who testified that the sheriff's reputation was injured as the result of the series of newspaper articles. The appellant contends that the sheriff's reputation would naturally be damaged by reporting the truthful facts regarding the two severe beatings of the inmates and their deaths and the facts relating thereto; that the evidence makes no distinction between the damages resulting from truthful reporting and that of any alleged malicious publication of alleged falsehood.

Be that as it may, we need not go into all these serious questions presented for our consideration for the reason that there appears to us to be a more obvious ground which requires a reversal, namely, the admission of prejudicial hearsay evidence. The motion for a new trial lists over one-hundred items of alleged hearsay as highly prejudicial before a jury. To go into each one of these items would unduly extend this opinion. We will consider only a few:

The first instance that comes to our attention is an affidavit taken from deputy sheriff Cottey while he was under suspension following his being named as a tipster to the newspaper reporter. The affidavit was introduced by the appellee-sheriff on the theory that it denied the fact that, as the newspaper claimed, Cottey had tipped off the investigation. Whether or not an affidavit may be used to prove the falsity of a newspaper item, particularly when the witness is available, is the single issue here. The record of the offer, objections and

ruling thereon appears in the record as follows, along with the voluminous three-page single-spaced affidavit admitted in the evidence:

"MR. JACOBS: We offer in evidence [Plaintiff's Exhibit] Reagan 133, 134 and 135.

"MR. SCANLON: Could I ask a preliminary question Your Honor?

"JUDGE: Yes sir.

"MR. SCANLON: Mr. Fields, Mr. Cottey continued as a Deputy Sheriff after he was reinstated following his suspension by you and he continues to be a Deputy Sheriff to today, does he not?
"A. Yes, I believe so.

"MR. SCANLON: And you have subpoenaed him on behalf of the plaintiff in this case, have you not?
"A. I think probably we have.

"MR. SCANLON: You don't know of any reason why he can't come here to testify, do you?
"A. No.

"MR. SCANLON: We object to the hearsay document Your Honor. The man is under subpoena by the plaintiff, is available, no reason why he can't come here and testify before the jury.

"MR. JACOBS: This, Your Honor, is an affidavit that was given by a member of the Department in regard to the matter in which . . . concerning the matter for which he was suspended. Your Honor probably does not recall, I will remind you, that this man Cottey is the one who is designated in the opening statement by Mr. Scanlon as having been one of the Deputy tipsters. So far as these subpoenas are concerned, as the evidence has shown already . . .

"MR. SCANLON: Excuse me Mr. Jacobs, could we be heard in the absence of the Jury Your Honor, on this, please.

"MR. JACOBS: It doesn't make any difference to me.

"JUDGE: Objection overruled. Show Plaintiff's Exhibit 133, 134 and 135 introduced in evidence." (Tr., p. 6303, 1. 17 to p. 6305, 1. 7; Summary of Evidence, pp. 1004 to 1005)
"(Exhibits Read To Jury By Mr. Jacobs)."

The Cottey affidavit (Plaintiff's Exhibits 133, 134 and 135) reads as follows:

"State of Indiana ⎱
⎰ ss:
County of Marion ⎰

AFFIDAVIT

"I, Arthur Cottey, being first duly sworn upon my oath, do depose and say:

"That I am a deputy sheriff of Marion County, Indiana and I have been continually so employed for about the last nine and one half (9½) years. I am forty-seven (47) years old and was born February 14, 1918. I live at 609 Beechway Drive, Apartment 17 in Indianapolis, Indiana.

"I was employeed as a deputy sheriff by Robert A. O'Neil in August, 1956 and was assigned to work in the jail division. While assigned to the jail I worked under Captain Frank Hawkins and Captain Lee Eads, when Robert O'Neil was sheriff; under Captain Dushan Stiko and Captain William Chance, when James Hiner was sheriff; and under Captain William Chance and Captain Richard Scott under the present administration of Sheriff Robert Fields. I have been subjected to disciplinary action on two occasions in the entire nine and one-half years, and on no others, and both of these involved suspensions with pay and both were when Richard Scott was commander in the jail. The first suspension was for five days with pay and happened just after a jail escape, of which I was supposed to have had prior information of. The second suspension is the present one, and I don't really know what it is for. Captain Richard Scott called me into his office about the jail break and questioned me about any knowledge I might have about it. I told him I had no knowledge, and even requested that I be given a lie detector examination to verify the truth of my statements. He, Captain Scott, refused to permit me to take the examination, and suspended me, as I said before.

"I really don't know why, but I believe Captain Scott has something against me and has tried on occasion to get me. I can remember several instances which took place under the administration of Robert O'Neil which might cause some hard feelings; the circumstances were, that I was working the jail desk and Captain Scott was a Lieutenant on the road patrol and would come back to the jail every time we had a disturbance of any kind and would

want to know what was going on, as the two divisions were separate and he didn't have anything to do with the jail. I told him that he didn't have anything to do with the jail and wouldn't let him in. He, Captain Scott, had been told about the jail break I mentioned before and just used me as someone to pass the blame to. Also, just before I went on vacation, there was an incident involving a call card to a bondsman; Captain Scott saw the name of one bondsman on the call card and saw that another bondsman had taken the man out, and without even asking me what had actually happened, took me off the jail desk and transferred me to the fourth floor.

"I *now* [sic] one Charles McAdams as being a present prisoner in the Marion County Jail, and a man who has been in jail several times in the last few years. Also, I have known Charles McAdams on the street for a total of about ten (10) years. I have always been friendly with McAdams, and he even asked me on several occasions to talk to an Indianapolis Police Department Detective, Sergeant Gene Meyers, in an attempt to get his sentence reduced.

"I remember that Charles McAdams was the cell boss in the BR cell block of the old jail and sometime after the new jail opened up he became the jail barber, and I believe a floor boy on one of the shifts. When I would come to work on the third shift, I noticed that he had almost the run of the jail. I have talked to Charlie McAdams on several occasions in the jail and about many different subjects, most of which I don't remember. I do remember one conversation that I had with McAdams, which occurred about two or three days before my vacation started (about October 20, 1965) ; Charlie told me that he had something to tell the newspaper about the incident he saw occur in the jail. I asked him if he wanted to tell me about it and he said that he wasn't talking to anyone but the newspapers. I didn't hear anything more about the conversation until I [was] notified by my son that I had been suspended. I later received a letter saying that I was suspended.

"All that I know about Charles McAdams is that he is a big liar, as proved by all the different stories he told about the jail beatings. If McAdams says that I told him anything about jail beatings or that he told me anything about jail beatings, he is telling a big lie. Also, if anyone says that I contacted any newspaper reporters or anyone else and had them talk to Charles McAdams, they are wrong.

"I have known Rick Johnson, a reporter for the Indianapolis Star for at least fifteen (15) years. I was a boxer

when I met Rick Johnson and he wrote several newspaper articles about me as a fighter. I consider that Rick Johnson is a fairly good friend of mine. For the past several years, even back when O'Neil was Sheriff, he has called me on the phone and talked to me and I have called him on the phone. Our conversations have been about many different things; we have talked about the Sheriff's Office, about the jail, about my job, about politics, and about almost anything that you could think of. Never in any of our conversations have I ever told Rick Johnson about any beatings in the jail, nor have I told him anything about any other incidents which would hurt the department.

"Not only have I not told anyone about any beatings in the jail, I have not witnessed any beatings nor do I know anything about any beatings which occurred in the jail. I have seen a lot of men hit in the jail, and I have hit a lot, but no one has ever been beaten as far as I know.

"While, as I have just stated, I have never said anything about beatings in the jail, I might have made some statements which sound like I have a grudge against the department. I kid around a lot and sometimes I might say something, which if overheard and took the wrong way, would make you believe that I was trying to get someone. I usually talk to the older men on the department and when we talk to each other, both of us would know whether we were kidding around, but someone overhearing the convervation would not.

"I do not have any feeling against either Sheriff Robert Fields or Major Alva Funk, and to the best of my memory I have never did anything or said anything that would hurt either of them. I do think that the sheriff goes along with a lot of things in the department because he doesn't know what is really going on.

"I have never said anything about Major Funk or anyone else in this department having or getting any tickets to the Indianapolis 500 Speedway. I did make a remark to one of the jail deputies about Major Funk having received some tickets to the State Fair, which were for the deputies. This is the only remark I made, and I meant nothing by it.

"If I had seen any beating in the jail or anything else that was wrong, I would have approached my commanding officer and told him about it. If, after this, nothing was done about the matter, I feel that I would have a perfect right to go the newspapers, or anyone else who could do something.

"Everything I have said in this statement is the truth so far as I know it, and I am willing to take a lie detector test to verify any of my answers. Further, if there is any suspicion that I am lieing [sic], I request that I be given an examination so that any suspicion may be resolved.

"I have read the three pages of this affidavit and have initialed each page thereof and each page contains the statements exactly as I have given them, and I swear that each statement is true and correct this 20th day of December, 1965.

Just what the significance of whether Deputy Cottey did or did not tip off the newspaper and whether it is true or false is difficult to understand. However, the fact that appellee had the burden of proving a statement to be false does not alter the accepted rules of evidence for such proof. Hearsay cannot be used to satisfy that burden.

It is our opinion the law is plain. Admission of hearsay of this type prevents cross-examination and confrontation. These elements are important to credible evidence. Under these principles mere affidavits are inadmissible. Wigmore 3rd Ed., §§ 1709 and 1384.

It cannot be seriously argued that the foregoing long affidavit is relevant and proper to prove the falsity of the inference that the sheriff failed to make a prompt investigation of the beatings. The affidavit was taken in November, 1965. The beatings and deaths of the two inmates occurred in July, 1965.

Under the same theory the appellee-sheriff offered in evidence a deposition of Cottey while he, the sheriff, was on the witness stand. It appears this was in direct violation of the statute in this state, which prevents the use of a deposition when the witness is available at the time of the trial. Burns' Ind. Stat. Anno. § 2-1506.

The record in this respect and the objections thereto appear as follows:

"The plaintiff, ROBERT H. FIELDS, was recalled to the witness stand, for continued

### Re-Direct Examination

"Questions by Mr. Jacobs, Attorney for the Plaintiff:

"MR. JACOBS: Now, Your Honor, we wish to read from the deposition of ARTHUR COTTEY, taken on—I think it was about—what?—October—I'll get the date later. I'll read the questions.

"MR. SCANLON: To which the defendants object for the reason it is improper re-direct examination. It is pure hearsay. It is an attempt to read from the deposition of one of plaintiff's agents and employees, and most of the, or many of the questions and answers are not relevant to the matters referred to on cross-examination, the matter on cross-examination being a matter of as best defendants could address themselves to the impeaching or contradicting the hearsay evidence admitted on direct examination of this witness, being the statement of plaintiff's agent, Arthur L. Cottey, as deputy, concerning conversations with Rick Johnson.

Also, that Arthur L. Cottey was agent of the plaintiff and sub-poenaed by the plaintiff and is available in Indianapolis as a witness.

"COURT: I'll overrule the objection.

"MR. JACOBS: Question 7. Question—this is Arthur Cottey: 'Did you ever have a conversation with Rick Johnson regarding the death of Elmer L. Reagan?'

"Answer, 'Never.'

"Question. 'Did you ever have a conversation with Rick Johnson regarding Elmer L. Reagan?' Answer, 'No, I can't say as I did.'

"Or Charles P. McAdams?" Answer, 'No.'

"Did you ever say to Rick Johnson this, or this in substance, in regard to the death of Elmer L. Reagan: 'You haven't even got half the story. The nut didn't kill that man, a Deputy did'?

"Did I ever hear that before?

"Question, 'Did you ever say that to Rick Johnson?'

"Answer, 'No.'

"Did you ever say to Rick Johnson: 'Don't start nosing around the jail, they (referring to prisoners and deputies) are scared to death. No one dares talk about it'?

"Answer, 'Did I ever say to Rick Johnson "quit nosing around the jail" '?

(The previous question was read to the witness by the notary).

"Answer, 'No, no, I never.'

"Question, 'Did you in regard to anything else, say that?

"Answer, 'I never told him to quit nosing around the jail. I didn't have the right to tell him that.'

"Question, 'Did you tell him prisoners and deputies were scared to death?' Answer, 'no.'

"Did you ever say to Rick Johnson, that is, did you state the name of a deputy sheriff.?

"MR. JACOBS: Strike that.

"Did you ever relate to Rick Johnson a report that a prisoner had told a Deputy Sheriff, you or any other Deputy Sheriff, that he had seen other Deputies beat Reagan on two different occasions on July 14th, 1965?

"Answer, 'No.'

"MR. JACOBS: 17 is passed.

"Question, 'Did you ever provide Rick Johnson with the name of the alleged attacker and with the names of other prisoners who saw the attack and were willing to talk?'

"Answer, 'No.'

"Question, 'Did you ever give Rick Johnson the names of Deputies who were involved in the beating, we are referring to the Reagan beating, or had first hand knowledge of it?' Answer, 'No.'

"Did you ever provide Rick Johnson with the names of prisoners in the cell block who could have seen the beatings?' Answer, 'No.' "

Here we have a deposition which had no more standing than that of an affidavit and was therefore hearsay. It was entered in evidence over objections. Deputy Sheriff Cottey was available as a witness. This deposition was offered on the theory that it went to prove that the newspaper statement that it was tipped off by deputy sheriff Cottey was false. Of course the best evidence to prove such a fact would be the direct statements of the witnesses who were present or alleged to have been present at the time—not their affidavits or statements made to someone else. McCormick on Evidence, § 234, p. 491; Wigmore, 3rd Ed., § 1411.

In another instance the appellee-sheriff attempted to bolster his own testimony and to prove the falsity of a newspaper report that McAdams said he had seen a deputy do the beating and the further implication that the sheriff had intimidated McAdams into making repudiation of the statements. The appellee-sheriff offered evidence on this point by taking the stand himself and repeating conversations he had with McAdams privately in the Sheriff's office, outside the presence of the appellant.

The record shows the following:

"Interrogation of Sheriff Fields by his attorney:

"Q. Did you have a conversation with him?
"A. I did.
"Q. Will you state to the Jury what that conversation was? Just a moment, they want to object. I asked him to state to the Jury what his conversation with McAdams was.

"MR. SCANLON: Well we have a continuing objection to this on both the ground of hearsay and on the ground . . . or the general statement that I've made in Objection Number One, so I don't have to repeat it all, Your Honor is familiar with it.

"MR. JACOBS: I think this conversation Your Honor is the context of the articles that have been introduced and is admissible as to the conversation with McAdams. There has been vast publications speaking of this contact with this witness.

"JUDGE: Objection overruled.
"Q. Just go ahead now and tell the Jury just what the conversation was there with McAdams?
"A. Well he walked in my office, I told him to sit down. He sat down in a chair in front of my desk. I said I understand you're not feeling too well Charlie. And he says, no, I've got a terrible hangover. I offered him a cigarette, which I think he took. I had the statement on my desk at that time. I said, I've read this statement you gave Charlie, I said I was informed that you said that this was some kind of political deal to get me out as Sheriff. Is that right? And he says that statement's false. I says, well now wait a minute.

"You say this statement is false, this whole statement is false? He says yes, that statement's just a bunch of lies. And I said, well get back to this other thing. What's this that you said that this was some kind of political deal to get me. And he says well that's what the purpose of it was. He says this was cooked up with Rick Johnson and Bud Cottey. I said why did you give them such a statement? He says, well because they said they'd get me out of Jail, and he said that Johnson also said he'd get me a job, but I don't need him to get a job. I also asked him, I said, did you tell the truth before the Grand Jury? And he said yes."

This hearsay was highly prejudicial on the issue of the falsity of the news stories.

Another instance of pure hearsay occurred when the sheriff took the stand and testified that Ed Lewis, his former law partner, had told him in substance that Johnson, the reporter, had come to him to see if he could make a deal with the sheriff with reference to retractions in the controversy arising from the publications. We need not set out the substance of the statements which the sheriff said his former law partner had told him Johnson told him. We are not here concerned with the fact that Lewis could and did take the stand for the Sheriff and repeated his conversation with the reporter Johnson of the newspaper. We are concerned here with the fact that the appellee in this case takes the stand and repeats what he claims was told him by this witness, his former law partner. Appellant claims this was highly prejudicial hearsay, used not only to bolster the testimony of Lewis, but also contradict that of Johnson.

Another typical example of hearsay is the admission into evidence of a letter written by the sheriff to Dr. Popplewell, Superintendent of General Hospital on March 25, 1964, about 18 months before the publications in question, complaining about a certain jail physician's poor service and the need for some medical supplies. There is no attempt to show that appellant-newspaper had any knowledge of the contents of

such a letter being sent. This hearsay could not possibly be relevant on the basis of proof of falsity of any issue under the circumstances.

In another instance deputy sheriff Mellene was put on the stand and related a conversation he had with Charles McAdams (not a party to the action) in which he stated that he had asked McAdams to tell the truth in the jury room and McAdams told him that Rick Johnson, the newspaper reporter, was an "S. B." and had it in for the sheriff.

There are too many instances of the above character of repeating conversations of third parties, to enumerate here. We can only give the above examples of the erroneous admission of hearsay testimony, most of it highly prejudicial. The record is replete with such hearsay. It is borne out with the following colloquy between the trial court and appellant's counsel at one point where objections were made because of hearsay that was offered and admitted:

"MR. SCANLON: . . . It is the defendant's position, first, that if any such evidence is offered on that issue of falsity, it must be competent evidence, and hearsay evidence has been introduced on that issue, so that

"JUDGE: That is your contention that it was hearsay and you object to it on that theory?

"MR. SCANLON: Yes, I don't know why it would be other than hearsay because, for instance, conversations between Deputy Sheriff's and other people not in the presence of the defendants, it seems to me would be hearsay.

"JUDGE: Well there would be very little evidence in this case Mr. Scanlon, if all this testimony had to be in the presence of the defendants.

"MR. SCANLON: That's true.

"JUDGE: Yes, sir.

"MR. SCANLON: I certainly agree with that. Unfortunately

"JUDGE: It would take about two days to try it."

The trial lasted approximately two months.

For the reasons stated, the judgment should be reversed, with directions to grant the appellant a new trial.

Hunter, C.J., concurs.

## SEPARATE OPINION

DEBRULER, J.—This appeal arises from a libel action in the Shelby Circuit Court filed by the appellee, former Marion County Sheriff Robert Fields, against Indianapolis Newspapers, Inc., Eugene C. and Eugene S. Pulliam. Appellee's complaint was in forty-four (44) separate legal paragraphs each one based on different articles and editorials published on forty-four (44) separate days in the Indianapolis Star, a daily newspaper owned by the corporate appellant. The trial commenced on April 18, 1967, and ended June 14, 1967. The parties produced ninety-six (96) witnesses and six hundred sixty-four (664) exhibits. The transcript on appeal runs to seven thousand six hundred fifty-one (7651) pages in eight (8) volumes. A verdict was directed in favor of the two individual defendants and the jury returned a verdict for the appellee on six paragraphs in the total amount of $60,000.00

The appellee's complaint alleged appellee was libeled in several different respects but the six recovery paragraphs, Nos. 12, 14, 18, 20, 37, 40, all concerned the Reagan case. The basic outline of the facts of the Reagan case are as follows: Elmer Reagan, a fifty-year old, alcoholic inmate of the Marion County Jail was admitted to the hospital on July 14, 1965, suffering from injuries received in a beating by another prisoner named William Brown. Reagan died as a result of the beating on August 7, 1965. The appellee who was at that time the Marion County Sheriff, filed charges against Brown on August 13th.

On October 21st, another prisoner named Charles McAdams told Marion County Criminal Court Judge Fife, in an inter-

view in court chambers arranged by appellant's reporter, Rick Johnson, that he witnessed Deputy Sheriff Donavan King beat Reagan on July 14th. On October 22nd, McAdams signed an unsworn statement to that effect and three days later his sentence was changed by Judge Fife to time served and he was released from jail. The prisoner, McAdams, was interviewed on October 26th, by appellee before and after McAdams' testimony before the Grand Jury investigating the charges. Appellee said McAdams repudiated his accusation concerning the deputy. McAdams also repudiated it in open court before Judge Fife on October 28th, and he was thereupon immediately sent back to jail. The Grand Jury report said McAdams' accusations were false and indicted Brown for murder. At the trial of Brown the jury found that Brown in fact attacked Reagan but he was acquitted by reason of insanity.

On October 27, 1965, the Indianapolis Star began the series of articles which became the subject of this suit. The six recovery paragraphs alleged that appellant intentionally or recklessly published articles which implied false accusations against appellee to the effect that he had committed certain crimes, namely, accessory after the fact to murder, intimidating a Grand Jury witness, and malicious prosecution of an innocent man. Each legal paragraph included twelve rhetorical paragraphs, the first eleven of which were identical for all forty-four (44) legal paragraphs. We shall use complaint paragraph twelve, the first recovery paragraph, as an example and we include only rhetorical paragraph twelve from that complaint paragraph.

"12.   Sunday, November 7, 1965, defendants maliciously published the printed matter reflected in Exhibit 12, hereto attached, having theretofore maliciously, and with premeditated purpose to so do, composed same so as to cause it to convey the false and defamatory meanings set forth below, when read in full context, and in context with previously published printed matter, by defendants, as shown by Exhibits 1 through 11, which are published on

the eleven previous days, consecutively, and which contributed to the meanings of Exhibit 12, as hereinafter alleged, and for that purpose are, by reference, made a part of Paragraph Twelve.

"12. (a), 12 (b) and 12 (c). Plaintiff, by reference and adoption, incorporates all allegations contained in subparagraphs 12 (a), 12 (b) and 12 (c) of Paragraph One, as though same were copied verbatim at this point."

The sub-paragraphs referred to are as follows:

"a. That plaintiff's deputies, or members of the Marion County Police Force, over whom plaintiff had direction and supervision, had murdered, or otherwise committed felonious homicide upon one Elmer L. Reagan, then and there a prisoner of the Marion County Jail, and that plaintiff assisted said deputies, as hereinafter alleged, with intent that they would escape punishment.

"b. That in order to assist plaintiff's said deputies, or members of the Marion County Police Force, over whom he had direction and supervision, who had murdered, or otherwise committed felonious homicide upon one Elmer L. Reagan, then and there a prisoner of the Marion County Jail, plaintiff, without probable cause, maliciously attempted to cause an indictment to be found, or otherwise prosecution to be commenced, against one William A. Brown for the aforesaid murder or felonious homicide of said Elmer L. Reagan, or conspired with others for said purpose.

"c. That in order to assist plaintiff's said deputies, or members of the Marion County Police Force, over whom he had direction and supervision, who had murdered, or otherwise committed felonious homicide upon one Elmer L. Reagan, plaintiff corruptly, and by force and threats, endeavored to influence, intimidate and impede a witness, to-wit: Charles P. McAdams, in a certain court of the State of Indiana, to-wit: The Criminal Court of Marion County and the Grand Jury thereof, and, by the same means endeavored to obstruct and impede the due administration of justice therein."

Thus, to find for appellee on complaint paragraph No. 12 the jury had to find that the articles comprising Exhibit 12, forming the basis for that paragraph, when read in the context of all the previous articles in Exhibit 1 through 11, accused the appellee of one of the above alleged crimes, that the

accusations conveyed by the articles were false, that appellant knew they were false or published them with reckless disregard of their falsity, and that appellee's reputation was damaged thereby.

We will confine our discussion for the most part to the first recovery paragraph, complaint paragraph No. 12, since the other five recovery paragraphs involve basically the same legal issues although the evidence is somewhat different for each.

The appellant alleges the following errors:

I. There was insufficient evidence to support the verdicts.

II. The verdicts were contrary to law because inconsistent.

III. The trial court erred in instructing the jury.

IV. The trial court erred in admitting hearsay evidence.

## I.

The appellant's first contention is that the evidence was insufficient to support the verdict in several respects. In reviewing a challenge to the sufficiency of the evidence this Court will not weigh the evidence nor determine the credibility of witnesses. We will look to that evidence most favorabe to appellee and the reasonable inferences therefrom, and determine whether that evidence, if believed, is sufficient to support the verdict for appellee. If it is, then the verdict will be affirmed. 2 I.L.E., APPEALS, §§ 571, 573, 574.

(A)    Appellant claims that there was insufficient evidence that the articles were in fact read as accusing appellee of any criminal acts.

We point out that on this issue, evidence that appellee was personally accused of *any one* of the three crimes would be sufficient to support the jury verdicts. We believe the evidence was more than ample to permit the jury to find that appellee was personally accused of all three of the crimes set out above in appellee's complaint. The evidence consisted of the articles themselves and the testimony of two witnesses.

There is no question that when read by an ordinary reader in context with the previous articles in the series, the articles comprising Exhibit 12 accused appellee of intimidating McAdams into repudiating his accusations and prosecuting Brown in order to cover up the murder of Reagan by a deputy. (See Appendix for Exhibit 12).

The appellant did not explicitly accuse appellee of the crimes alleged. However, the accusations were clearly implied by what appellant did say and the way it said it, when read in full context. This context was created by the statements explicitly published; the choice of loaded words; the choice of juxtaposition and sequence of ideas; the rhetorical questions; and the cumulative weight of constant repetition. This context cannot be conveyed by paraphrase but we will set out a few of the items reported in Exhibits 1 through 12.

McAdams' story that a deputy killed Reagan was the keystone of the whole attack on appellee. If McAdams' story was true, then any repudiation would have been obtained from him by intimidation or bribery, either of which would be tampering with a Grand Jury witness; similarly, the prosecution of Brown would be a malicious one against an innocent man.

The article published on October 27th, the day the series began, reported in detail McAdams' story that he personally witnessed the beating of Reagan by a deputy on Juy 14, 1965. The Star repeated the essence of this story every day except one, up to and including November 7th, the day of publication of Exhibit 12, and on nineteen (19) days thereafter.

The appellant attempted to buttress McAdams' story by printing that three anonymous tipsters, two of them deputies, had other eye witnesses to the beating by the deputy; by printing statements of other prisoners and McAdams' girlfriend to the effect that McAdams had told them the story about a deputy beating Reagan and that they believed McAdams; by printing several stories of other incidents of alleged brutality in the jail, some even predating appellee's

appointment as Sheriff; and by stating that no investigation was started until circumstances of the death were bared by the Star. It is impossible to understand the devastating nature of this attack without reading the actual exhibits. Unfortunately they comprise sixty-two (62) separate articles and cannot be included in this opinion. At the risk of not fully conveying the clarity of the attack we have included some of the articles in the appendix.

The way the publications accused appellee of intimidating McAdams, a Grand Jury witness, was by repeating McAdams' original story, supporting the truth of it as described above and almost totally ignoring the conflicting evidence; printing that appellee "seized" McAdams and McAdams repudiated his story only after appellee "interrogated" him; printing that McAdams "vanished" or "disappeared" after the questioning by appellee; repeatedly printing both Marion County Criminal Court judges' comments that Grand Jury witnesses would be protected from harassment and could not be interviewed except in the presence of the judge. In Exhibit 7 (See Appendix) the "protection" issue was followed by setting out the criminal penalties for tampering with a Grand Jury witness, followed immediately by the story that appellee obtained McAdams' repudiation after taking him to jail and interrogating him. The clearest examples of accusing appellee of intimidating McAdams were in the editorials, Exhibits 2 and 3. (See Appendix).

The publications accused appellee of malicious prosecution of an innocent man, Brown, by emphasizing McAdams' story that a deputy, not Brown, had in fact killed Reagan; implying Brown was shackled at the time and could not have attacked Reagan (See Exhibit 12 in Appendix); stating that the charges against Brown were not filed until after the Star published a report on Reagan's death. (Again see Exhibits 2 and 3 in Appendix).

Neither is there any doubt that the accusations were against

the appellee personally. Appellee is mentioned by name sixty-eight (68) times in the series and twenty-seven (27) times in the first twelve exhibits. Appellee is mentioned by use of the phrase "the sheriff" forty-seven (47) times in the series and twenty-six (26) times in the first twelve exhibits. Appellee was at that time the one and only Marion County Sheriff. The phrase "The Sheriff's Office" or "the Sheriff's Dept." was used seventy-two (72) times in the series and thirty-six (36) times in the first twelve exhibits. In the first twelve exhibits appellee is explicitly named as the person who interrogated McAdams and obtained his repudiation of the story that a deputy killed Reagan; he is explicitly mentioned as the person under whose jurisdiction the jail is run and who is thus responsible for its operation.

Appellant cites *New York Times* v. *Sullivan* (1964), 376 U. S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686, and *Rosenblatt* v. *Baer* (1966), 383 U. S. 75, 86 S. Ct. 669, 15 L. Ed. 2d 597, as support for its position. This case has nothing in common with *New York Times* v. *Sullivan, supra.* That case concerned a single publication in which the plaintiff was not mentioned by name or office. Neither is it like *Rosenblatt* v. *Baer, supra,* where again, the plaintiff was not mentioned in any way by name or office.

In addition to the articles themselves, Eugene S. Pulliam, a witness for appellant, testified that he thought Exhibit 3 did imply that appellee intimidated McAdams. Exhibit 3 was made a part of the complaint paragraph No. 12 to provide the context in which Exhibit 12 was to be read.

In addition, Judge Davis testified that he read the series of articles as accusing appellee of intimidating a witness and prosecuting an innocent man.

Since appellant did not attack the legal sufficiency of the complaint by demurrer in the trial court it conceded that the articles were *susceptible* of the interpretation alleged by appellee in his complaint. It was for the jury to determine if a

reasonable reader using words in their ordinary everyday sense would read the articles as implying the meanings alleged by appellee. *Logan* v. *Logan* (1881), 77 Ind. 558. The jury was not bound to accept appellant's, appellee's or any witness' reading of the exhibits. The jury was so instructed in court instruction number 23 *submitted by the appellant itself.*

(B) Appellant contends there was insufficient evidence that the accusations against appellee implied by the articles were false.

We note here again that the key event in this whole affair was the story by McAdams that Deputy King beat Reagan on July 14th. That story made possible and gave rise to the alleged accusations of crime against appellee. If that story was false, then appellee did not need to intimidate McAdams and prosecute Brown in order to protect Deputy King from murder charges. We believe there was ample evidence to support the jury finding that McAdams' story was false.

McAdams said, in relevant part:

"On June 5, 1965 I was put in the Marion County Jail awaiting trial on a larceny charge. On July 14, 1965 I had been made assistant cell boss in the BR cell block *on the main floor of the jail.* My cell was in the front of the block where I could see the main floor where the deputies worked and what they called the attorneys cage. On July 14, *at approximately 6 p.m., it was after supper,* I overheard and saw a series of arguments between Sgt. Donovan King and a prisoner in the attorneys cage I knew to be Elmer L. Reagan. King and Reagan were arguing over medicine. Reagan said he wanted his medicine and King told Reagan he was out of medicine. Reagan told King that he couldn't be out of medicine that the doctor had given him a refill that day, July 14. King said I don't give a damn who filled the order there's no medicine for you so I can't give you none. Reagan got mad and called Sgt. King a mother fucker. Sgt. King left the attorneys cage walked to the jail desk to get a handcuff key to unlock the hand cuffs which were being used as a lock on the cage. King got the handcuff keys walked back to the cage, unlocked the handcuffs and went inside the cage with Reagan. King grabbed Reagan, shoved him and said to Reagan, you'll eat those words . . . King kicked Reagan's ass and grabbed Reagan's

arm, said 'you are going down stairs.' King twisted Reagan's arm behind him and pushed him toward the basement door. King and Reagan went down the steps and *deputy Floyd Grundon* [sic] followed them both downstairs. There was a few minutes of silence and then I heard a bunch of hollering and screaming going on. In about five minutes, Sgt. King and *deputy Grundon* and deputy Don Marshall came back up the steps to the main floor. I believe Marshall was already in the basement.

"In about an hour and a half, that would be approximately 7:30 p.m. July 14, King went back down the basement steps and I heard some more screaming and hollering, it sounded like the man kept screaming and repeating you are killing me, you are killing me. Then there was a bunch of silence. King came back up the steps by himself after about 10 minutes.

"At about 10:45 p.m., *I know because it was just before Sgt. King went off duty*, King brought Reagan back upstairs and took him back to the attorneys cage. Reagan was bent over and moaning and holding his midsection. King said you are a contrary son of a bitch and hit Reagan in the back of the neck and knocked Reagan into the corner by a radiator in the cage . . . You'll watch who you call a mother fucker from now on, King said and I then saw King kick Reagan in the midsection. Reagan screamed when King kicked him. King left the cage and locked it and went downstairs. Reagan kept crying to please get him a doctor. He did this about three or four times. I then heard someone say, you'll get a doctor you son of a bitch. Then everything quieted down. About this time Sgt. Brown, the third shift Sgt. came to work and he and King had a long talk back of the desk on the main floor.

\* \* \*

"After Sgt. King and Sgt. Brown had their conversation, King left. Brown made no attempts to get the man medication or give him aid. Reagan just layed there till about 1:30 in the morning. I went to sleep and when I woke up some of the guys in the cell told me they had taken Reagan to the hospital. I heard Reagan died later in the hospital." (Emphasis added.)

The evidence is overwhelming that this story was false. An integral part of McAdams' story was the definiteness as to the time the beating took place on July 14th. His recitation of details made his definiteness seem plausible and lent

an air of authenticity to this story. However, the hospital records show that Reagan was admitted at 5:09 p.m. on July 14, 1965, *prior* to the time of the beating according to Mc-Adams' statement. The jail records show that Reagan was *not* in a first floor cell on July 14th, but was in a basement cell, and that Deputy Grunden was not even on duty that day. The *only* scrap of evidence in the whole record that a deputy beat Reagan was McAdams' story. In addition to repudiating this statement to appellee, McAdams repudiated it in open court on October 28th, before Judge Fife who promptly returned him to jail because of it. The Grand Jury report said McAdams' original story was false and they indicted George Brown, another prisoner, for the murder. There were four prisoners who saw Brown attack Reagan and they summoned three deputies who then shackled Brown to prevent further injury to anyone. The jury at Brown's trial found that he had attacked Reagan but was not guilty by reason of insanity. In addition, appellee denied at trial that he intimidated McAdams or prosecuted Brown to cover up a murder. The jury chose to believe appellee and we will not disturb that finding.

We believe there is ample evidence from which the jury could have found that the claim that a deputy killed Reagan was false, there was no attempt by appellee to cover up a murder by a deputy, that appellee did not intimidate Mc-Adams, and that appellee did not prosecute an innocent Brown in order to protect his deputies from a murder charge.

(C) Appellant claims there was insufficient evidence that appellant published the alleged accusations with knowledge of their falsity or reckless disregard of their truth.

Appellee was a public official seeking damages for defamation by appellant in a series of articles attacking appellee's official conduct. In order for appellee to recover he had to prove that appellant published the defamatory falsehoods with actual malice. *New York Times* v. *Sullivan, supra.* In that

case the United States Supreme Court held that the First Amendment guarantee of freedom of the press required that publishing with malice meant publishing with "knowledge that it was false or with reckless disregard of whether it was false or not." In *Garrison* v. *Louisiana* (1964), 379 U. S. 64, 85 S. Ct. 209, 13 L. Ed. 2d 125, that court elaborated on the meaning of "reckless disregard" by saying that publications are made with "reckless disregard" of the truth when the publisher has a "high degree of awareness of their probable falsity."

In reviewing appellant's contention then we must look at the evidence most favorable to appellee to see if it was sufficient to support the jury's finding that appellant published the defamations with knowledge that they were false or with reckless disregard of whether they were false or not.

(1) We emphasize again that the central event in this affair was the story by McAdams that Deputy King beat Reagan. That story created the context and made possible the accusations of crime against appellee. If appellant knew that McAdams' story was false or knew facts which indicated its probable falsity, then it published with actual malice the accusations that appellee was trying to protect a deputy from murder charges by intimidating McAdams into repudiating his story and by prosecuting Brown.

Prior to November 7th, the date of the first recovery paragraph, appellant, including appellant's reporter, Rick Johnson and its editors, had direct knowledge of the hospital records which showed that Reagan was admitted to the hospital at 5:09 p.m. on July 14, 1965. Appellant knew this contradicted McAdams' story. McAdams said Reagan was beaten the first time at 6:00 p.m., again at 7:30 p.m. and again at 10:45 p.m. He was definite as to the times and even substantiated it by recalling the latter time as being near the time King went off duty. Appellant knew this was not a minor inconsistency that could have resulted from a momentary lapse of memory

or slip of the tongue. The hospital records struck at the heart of McAdams' story. However, appellant reported only once the fact that the hospital records showed Reagan was admitted at 5:09 p.m. on July 14th, and the significance of this was not brought out. It was mentioned thirty (30) paragraphs deep into the article:

> "McAdams, who later repudiated his story after questioning by deputies, originally maintained that Reagan was first struck at 6 p.m. July 14.
>
> "Records show Reagan was taken to the hospital at 5:09 p.m. July 14. Did McAdams tell the truth, but make a mistake about the time or day? Or did he make up the story? At least three persons, including his girlfriend, said McAdams told them he saw a deputy beat a man to death."

Appellant continued to publish McAdams' original story but never again mentioned the fundamental time discrepancy.

Appellant also knew that McAdams had already repudiated his story on October 28, 1965, in court to Judge Fife, besides earlier repudiating it to appellee. Appellant published this fact *only once,* but then in subsequent articles continued to omit it while still saying that McAdams repudiated his story only after appellee's deputies "seized" him and appellee interrogated him.

(2) Appellant in Exhibit 1 reported that an anonymous informant and two deputy "tipsters" made statements to Johnson about the Reagan case. Publishing these statements tended to strongly substantiate McAdams' story by, among other things, indicating that there were several other eye witnesses to the beating of Reagan by a deputy.

Exhibit 1 reads in part as follows:

> "Then two days later on Aug. 14 he received a tip from a man who told:
>
> "You haven't even got half of the story. The nut didn't kill that man. A deputy did.
>
> "The tipster gave Johnson the name of the deputy and some advice:

"Don't start nosing around the jail. The (prisoners and deputies) are scared to death. No one dares to talk about it.

"The vital tip came at 1 a.m. Oct. 7. It was a report that a prisoner told a deputy sheriff that he had seen another deputy beat Reagan on two different occasions on July 14. The deputy provided Johnson with the name of the alleged attacker and with names of other prisoners who saw the attack and were willing to talk. Some had been moved to other penal institutions.

"On Oct. 8 another deputy gave Johnson the names of deputies who were involved in the beating or had first-hand knowledge of it. He also provided the names of the prisoners in the cellblock who could have seen the beating."

This article clearly says that as of October 8th, Johnson had been told the name of the alleged deputy attacker, the names of *at least* two prisoner eyewitnesses to the attack, the names of *at least* two deputies who were eye witnesses to the attack. However, there is sufficient evidence to show that appellant knew when it published that exhibit that it had not been given any such information.

Appellant alleged the August 14th tip came from Deputy Robert Atwell. At trial Atwell denied telling Johnson anything remotely like the statements attributed to him by Johnson. Atwell said that *after* September 1st, he told Johnson of the rumor that Deputy King might be involved in the Reagan affair. Atwell stated that as far as he was concerned it was an "unbased rumor." This rumor could very well have been due solely to the fact that Johnson himself was telling that story to certain deputies at the jail.

At trial Johnson claimed that the October 7th tip came from Deputy Cottey. This portion of Exhibit 1 clearly says that appellant knew the name of the attacker and the names of other eye witnesses to the beating besides McAdams. However, Cottey's testimony was that all he ever told Johnson was that a prisoner named McAdams wanted to talk to a newspaper man about something that happened in the jail.

Johnson claimed that the October 8th tip came from Deputy

Finney. This part of Exhibit 1 clearly states that the deputy gave Johnson the names of other eye witnesses to the beating besides McAdams, both deputies and prisoners. Finney testified that late in October he told Johnson, upon request, the names of the deputies who worked the second shift in the jail *as of October,* which included King, Grunden and Ping. The date of July 14th was not mentioned. Appellant stated in its answers to the interrogatories that the deputies named by this tipster, who according to the article were involved in or had first hand knowledge of the beating, included Deputies Grunden and Ping. However, Grunden was not on duty on July 14th, and Ping had not even joined the department on that date. It is interesting to note that Grunden was also mentioned in McAdams' original statement. There is sufficient evidence in the record to support a jury finding that the three deputies did not make the statements attributed to them by appellant and the statements were, therefore, to some extent fabricated by appellant.

We believe the above evidence was sufficient to sustain the jury finding that appellant published the defamations with knowledge of their falsity or reckless disregard of whether they were false or not.

(3) Although the above evidence was sufficient to sustain the jury finding of actual malice, there was a third category of evidence relevant to the issue of appellant's malice and that was the appellee's evidence that prior to the publication of Exhibit 1 appellant and its reporter Rick Johnson harbored ill will and hatred against the appellee. This ill will originally stemmed from appellee's handling of the Hynes case in November, 1964. Prior to that time appellant had evidently approved of appellee's official conduct.

On the evening of November 17, 1964, Lee Hynes' body was found. Three suspects were questioned. One was cleared and he, but not his name was released. At 5:00 a.m., November 18th, the murder weapon was found, and then the other

two were arrested and charged with the murder of Hynes. At this time the arrests and names of the suspects were made known.

Appellant's reporter Johnson was displeased with this because the news was not available for the Indianapolis Star's deadline. He called appellee to complain about this. Appellee told Johnson that to have released the information any sooner would have jeopardized the investigation. Johnson said that was a bad policy and apparently his employers agreed with that assessment.

Johnson then immediately had another disagreement with appellee's policy in releasing news in a case involving two shoplifters. Johnson called appellee and threatened to put him on the front page of the paper unless appellee "shaped up." The next day appellant published an article stating that appellee had "silenced" his employees. Appellee then banned Johnson from getting any news at the jail. On December 4th and 5th, 1964, around midnight Johnson called appellee to complain about the ban and threaten appellee with keeping him on the front page "as long as it takes."

The law librarian in the City-County Building testified that during this period she heard Johnson call appellee a son-of-bitch. Politically, I'll kill him." After a so-called reconciliation even with him." The prosecutor of Marion County testified that he heard Johnson say "I'm going to get the son-of-a-bitch and he'd better remember what happened to his predecessor." Winston Churchill, a Sergeant on the Indianapolis Police Department stated that Johnson told him, "I'll kill the son-of-a-bitch. Politically, I'll kill him." After a so-called reconciliation between Rick Johnson and appellee, Rick Johnson, said, "Well, the son-of-a-bitch kissed the book." There was also evidence that appellant's reporters were saying that they were going to put appellee through "journalism school."

In August of 1965, the appellant wrote a series of articles supporting Deputy Charles Haine who was under suspension

by appellee for taking a bribe on August 7, 1965. These articles implied that Haine was being framed. Haine was found guilty by the Merit Board on October 20, 1965. The next day Johnson met with McAdams and that meeting soon resulted in McAdams' original story and his release from jail.

Appellant argues that ill will evidence is not admissible because it is not relevant to appellant's actual malice in publishing the alleged accusations against appellee. Appellant cites *New York Times* v. *Sullivan, supra; Garrison* v. *Louisiana, supra; Henry* v. *Collins* (1965), 380 U. S. 356, 85 S. Ct. 992, 13 L. Ed. 2d 892; and *Beckley Newspapers Corp.* v. *Hanks* (1967), 389 U. S. 81, 88 S. Ct. 197, 19 L. Ed. 2d 248, in support of its proposition.

None of these cases supports appellant's contention. The question of the admissibility of ill will evidence did not arise in those cases, nor did the United States Supreme Court even discuss the exclusion of such evidence offered on the issue of malice.

Those cases were concerned with the *legal definition* of actual malice. In *New York Times* there was no mention of the concept of ill will evidence at all. In the other three cases the Supreme Court was concerned with the legal standard for determining "reckless disregard" that was to be incorporated in the jury instructions on malice. They held that malice may not be *equated* with ill will and the jury may not be instructed that ill will evidence alone is sufficient to prove malice.

Appellant's argument is that ill will evidence is not *admissible* on the issue of whether appellant published with reckless disregard for the truth. We believe that it is relevant and admissible on that issue. It is true that ill will evidence does not tend to prove that appellant had *knowledge* of the falsity of its publications. However, actual malice may consist in a "high degree of awareness of their probable falsity." *Garrison v. Louisiana, supra.*

Appellant's estimate of the probability of falsity of its publications was not derived with mathematical exactness from purely objective factors. It was certainly influenced by various considerations one of which might very well have been appellant's hatred for appellee. Ill will evidence might also tend to prove that appellant published in spite of its estimate of a probability of falsity. We also believe that there is sufficient evidence of appellant's actual malice without even considering the ill will evidence.

(4) There is still more evidence in the record relevant and admissible on the issue of appellant's actual malice. Johnson made no effort to verify McAdams' story in even the obvious easy ways, in spite of the following facts: McAdams was a petty criminal, had an unsavory reputation, and McAdams was obviously making a deal to gain his freedom. Even Johnson's version of the way he and McAdams dealt at their first meeting should have been alarming:

"A. The first thing that happened was McAdams was placed into Judge Fife's Jury Room with me. We were alone. I introduced myself, told him I had received information from Deputy Cottey that he wanted to talk to me. I said, 'Bud's a good friend of mine,' I said, 'How are you with Bud?' He said, 'Bud and I are fine, and I do want to talk to you, *but not until I get out of Jail,*' and I said, '*Well what's it about? Can't you give me an idea?*' and he says, '*Not till I get out of Jail,*' so we, more or less (had a) general discussion, what you could call a 'feeling out process,' I suppose, having just met each other. He told me he had worked as a boat builder somewhere in Illinois, had worked on fiber glass boats; that he was a barber by trade; that he had got a bum rap when he was convicted of theft of barber shears, that he hadn't actually stolen, he just forged a name when he hocked them. That was immaterial, so we talked for a few more minutes, I told him that I heard that Deputy Donovan King had beaten an inmate by the name of Reagan, while this man was in solitary confinement, and had then teargassed him and then beat him again, and the man was later taken to the Hospital and ultimately died. I finished repeating that to him, and I said, '*Well, what do you have to*

*say about it?' All he said was, 'That's a pretty good story.' I said, 'You mean you're not going to confirm or deny it?' He said, 'No.' I said, 'Well, will you tell your story to the Judge?' He said, 'Yes, I'll tell it to the Judge.'* So at that time, I believe I left the Jury Room and went outside to see if Judge Fife was there.

Q. About how long did that meeting take place between you and Mr. McAdams?

A. Well, I didn't keep any record of the time. My best estimate would be no more than thirty minutes, possibly less, because I didn't attempt to keep track of the time.

Q. All right, then what happened when you went to see the Judge?

A. The Judge wasn't in, and it would be some time until he did come in and reconvene Court, according to his Bailiff, Mr. Patterson. I went back into the Jury Room for a few moments and told Mr. McAdams this, asked him if I could bring him a sandwich or some cigarettes. He said, 'No, I'm not hungry, and I've got a smoke,' *and we might have had another conversation at that time regarding what would happen to him if he did talk. He wanted to know if he could get out of Jail,* and I said, 'There are a number of things; there could be probation; time could be cut to time served. There's any number of things that could happen, but that is not up to me. That's up to the Judge, *and it all depends upon what you have to say.'* He made no comment on this. He still wanted to talk to the Judge, and at that time I left him in the Jury Room and I believe Deputy Hall then placed him from there into the lockup.

Q. Did you later that day then, meet with Judge Fife?
A. Yes." (Emphasis added.)

On October 22nd, in the presence of Judge Fife, the coroner and Johnson, McAdams signed a *notarized* statement, *not a* sworn statement under oath. After McAdams left Johnson raised the issue of further verification of McAdams' story but the matter was dropped. If McAdams' story had been true, between seventy (70) to one hundred (100) prisoners would have been able to verify it in some way, but none did. Appellant was content to print several stories from prisoners

and McAdams' girlfriend to the effect that McAdams had told them the story and they believed him. At least one of these prisoners would have been an eye witness if McAdams' story had been true. Four prisoners on a work crew witnessed Brown attack Reagan and summoned three deputies who shackled Brown to prevent further such attacks, but appellant did not interview them.

Appellant argues that the above evidence is inadmissible because the *New York Times* standard of reckless disregard cannot be satisfied by evidence of failure to investigate. The Supreme Court has not held that evidence of failure to investigate is *never* admissible on the issue of malice. In *St. Amant* v. *Thompson* (1968), 390 U. S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262, the Court said:

> "These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U. S. at 731.

In certain circumstances evidence of a failure to investigate would be circumstantial evidence relevant to the issue of whether or not the publisher in fact entertained serious doubts as to the truth of the publications. As the Supreme Court also said in *St. Amant:*

> "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness

may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U. S. at 732.

We believe that this evidence was admissible on the issue of reckless disregard.

(D) Appellant claims there was insufficient evidence to show that appellee was damaged by any of the alleged accusations in any of the paragraphs on which appellee recovered. It argues that appellee confuses proof as to the amount of damages with proof as to the fact or cause of damage with respect to the six recovery paragraphs. All of appellee's witnesses testified that the series hurt appellee's reputation, but did not say what it was in the articles that hurt appellee's reputation, nor which articles they referred to. Appellant does not question the amount of damages.

In each legal paragraph appellee alleged his "good reputation was ruined by the publication specified in (rhetorical) paragraph No. 12, resulting in his being held up to public scorn, shame and disgrace, to his damage" in the amount of $51,872.41. Thus, appellee's complaint alleged general damages for injury to his reputation and mental suffering, resulting from the false accusations of crime made by appellant in Exhibits 1 through 44, published in the Indianapolis Star, a daily newspaper which had an average circulation of 225,-584 each weekday and 360,742 on Sunday.

Prior to his becoming Sheriff appellee was an attorney, engaged in the private practice of law, an occupation especially dependent upon the practitioner's good reputation in his community. This is also true of a political officeholder which appellee had become when he was appointed Sheriff.

At the trial appellee put on several witnesses, consisting of attorneys, politicians from both parties, and public officials, from appellee's community, who testified that the series of articles on which the complaint was based, damaged severely appellee's reputation in that community.

The witnesses' testimony certainly was sufficient to support the jury finding that appellee's reputation had been damaged by the series of articles in question. The *fact* of damage was thus established. Other evidence, discussed above was sufficient to support the jury finding that in the six recovery paragraphs appellant intentionally or recklessly published false imputations of crime against appellee. General damages to a person's reputation are presumed to follow from the imputation of crime.

> "Any defamatory imputation may of course be conveyed in libelous form. By the beginning of the nineteenth century it was well established that any libel, as distinct from the same imputation in the form of slander, was actionable without the necessity of pleading or proving that the plaintiff had in fact suffered any damage as a result of it. In other words, the existence of damage was conclusively assumed from the publication of the libel itself, without other evidence that there was any damage at all. The practical result is that the jury may award not only nominal damages, but substantial sums in compensation of the supposed harm to the plaintiff's reputation, without any proof that it has in fact occurred. This is the accepted rule in England, and it is still the law in a small minority of the American jurisdictions.
>
> "The great majority, of some thirty-five other courts, have agreed where the publication is defamatory upon its face. They have disagreed, however, where extrinsic facts are necessary to make out the defamatory meaning conveyed; and they have held that such libel 'per quod' is to be treated like slander. If the imputation falls into one of the four special slander categories, it is actionable without proof of special damage. If it does not, there can be no recovery unless special damage is pleaded and proved." Prosser, TORTS, § 107 (3d ed. 1964).

In this case damages are presumed from the malicious publication under either the majority or minority rule; under the minority rule because it is a *libel* or under the majority rule because it involves one of the four special slander categories, namely, accusation of crime. See the

thorough discussion in *Gibson* v. *Kincaid* (1967), 140 Ind. App. 186, 221 N. E. 2d 834 (concurring opinion of Judge Faulconer).

> "As in other cases of tort injuries, there are two general classes of compensatory damages allowable for defamation: (1) general damages, or those which the law presumes to be the natural, proximate, and necessary result of the publication; and (2) special damages, or those which, although a natural and probable consequence thereof, are not assumed to be necessary or inevitable, and must be shown by allegation and proof. It has been said that the general damages presumed from the publication of libelous matter, while not susceptible of being accurately measured, are generally more substantial and real than those designated as actual, and measured accurately by the dollar standard." 33 Am. Jur., Libel and Slander, § 200.
>
> "Since the proximate and necessary consequence of a defamatory publication is injury to the feelings, reputation, or business of the person defamed, compensation for such injury is recoverable as general damages." 33 Am. Jur., Libel and Slander, § 204.

The jury was instructed that the damages were to compensate appellee for injury as the proximate result of the alleged accusations. Certainly, the jury could infer that those accusations caused the damage to appellee's reputation. The jury returned a verdict of $10,000.00 on each of the six paragraphs. We believe there is sufficient evidence to support the jury verdict.

Appellant cites *Linn* v. *United Plant Guard Workers* (1966), 383 U. S. 53, 86 S. Ct. 657, 15 L. Ed. 2d 582, for the proposition that the First Amendment required that appellee prove that the defamatory statements caused him damage. That case is not applicable here because it was concerned only with alleged libels occurring in the context of a labor dispute within the jurisdiction of the National Labor Relations Board. The court held that National Labor Relations Board jurisdiction over the labor dispute did not pre-empt all state libel actions, but restricted them to cases where the plaintiff proved actual malice and damages. This restriction was intended to mini-

mize conflicts with the National Labor Relations Board while preserving the states' interests in preventing malicious publication of defamatory falsehoods.

## II.

Appellant's next contention is that the verdicts are contrary to law because they are inconsistent. The jury returned a verdict for appellee on six paragraphs out of the forty-four (44) in the complaint, Nos. 12, 14, 18, 20, 37, 40, but returned a verdict for appellant on the other thirty-eight (38) paragraphs.

Appellant argues that the evidence on the issues of falsity, malice and damages was identical for all forty-four (44) paragraphs of complaint so the verdicts must be consistent. Appellant also says that appellee's strongest case of libel was to be found in the publications in complaint paragraphs prior to the first recovery paragraph, but the jury returned verdicts for appellant on those paragraphs.

The Court indulges every reasonable presumption in favor of the legality of jury verdicts. *State Farm Life Ins. Co.* v. *Spidel* (1964), 246 Ind. 458, 202 N. E. 2d 886. Each of the forty-four (44) complaint paragraphs constituted a separate and independent cause of action. It is clear that the evidence was not the same for all of these paragraphs. Each paragraph was based on different publications and the evidence of malice for some of the paragraphs was different from that for others. When jury verdicts on distinct causes of action are challenged as being contrary to law because inconsistent the role of the reviewing court is simply to determine whether there is sufficient evidence to support the verdicts in favor of the appellee. If there is such evidence then those verdicts will be sustained and this Court's inquiry will cease. The fact that appellant could have been hurt worse by more verdicts for appellee is not grounds for throwing out the verdicts actually returned for appellee.

This case is clearly distinguishable from those cases where

the verdict is inconsistent because it is a logical or legal impossibility, *e.g.*, an agency situation where the jury found for the sole acting agent while holding the non-acting master liable. In that case the reviewing court does not intrude into the central jury function of determining the facts and reaching the verdict based on that determination. There is no way an appellate court can effectively do that and that is what appellant asks in this case. Appellant concedes that the evidence on all issues on every paragraph is not identical. Therefore, the inconsistency in the jury verdicts does not result from a logical or legal impossibility but from appellant's recommendation as to how the jury should have viewed the evidence.

## III.

Appellant contends that the trial court erred in giving certain instructions and refusing certain instructions tendered by appellant.

(A) Appellant says the trial court erred in giving instruction No. 20, which reads as follows:

> "Only those false statements made with the high degree of awareness of their probable falsity may be the subject of civil libel. Even though publications are used as a tool for political ends, does not automatically bring it under the protective mantle of the constitution. The use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be affected. Known falsehoods fall into that class of utterances which are no essential part of any exposition of ideas and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. Hence the knowingly false statement with reckless disregard of the truth does not enjoy constitutional protection."

Appellant argues that this instruction is not a statement of the law relevant to the case but is an argument; it is the "reasoning" in *Garrison* v. *Louisiana, supra,* and therefore

not suited to be included in a jury instruction; it invades the province of the jury by assuming contraverted facts.

We believe it is clear from reading this instruction that it properly states the law as far as it goes. It does not assume any facts nor invade the province of the jury. The fact that the language is based on the *Garrison* case adds support to it and labelling it "reasoning" does not seem relevant to us. All the applicable law cannot and need not be included in one instruction. *Palmer* v. *Decker* (1970), 253 Ind. 593, 255 N. E. 2d 797; *McClure* v. *Miller* (1951), 229 Ind. 422, 98 N. E. 2d 498; all the instructions must be read together. *State* v. *Coridan* (1943), 221 Ind. 404, 47 N. E. 2d 978. When this is done it is clear that there is no error in this instruction.

(B) Appellant says the trial court erred in giving instruction No. 30 and refusing appellant's tendered instruction No. 7. Number 30 reads as follows:

> "Evidence tending to establish that the defendant harbored ill will toward plaintiff prior to the publications in question may be considered only upon the issue of whether or not the defendant published the articles in question with knowledge of falsity or with reckless disregard whether they were false or not."

Appellant objected to this instruction as follows:

> "The defendant objects to Instruction No. 8 tendered by the plaintiff, for the reason that (1) it is the defendant's position and has been throughout the trial that evidence of ill will is not to be considered by the Jury for any purpose, and the Court has permitted such evidence of ill will to be admitted without restricting its application, and the plaintiff's evidence having consummated almost eight weeks, it would be impossible now for the Court to give any instruction limiting to the application of such evidence of ill will to the issue of reckless disregard."

Appellant's tendered instruction No. 7 would have instructed the jury that ill will evidence was completely irrelevant to this case.

The sole issue raised by appellant's objection and offer of appellant's tendered instruction No. 7 was whether ill will evidence was admissible on the issue of whether appellant published the articles in question with knowledge that they were false or with reckless disregard for their falsity. We have decided above in section I(C) that it was admissible on that issue and only on that issue. That is precisely what the trial court instructed the jury.

For the first time on appeal appellant attempts to argue that instruction No. 30 is erroneous because it tells the jury that ill will is the same as reckless disregard; because it does not tell the jury that actual malice had to be based on evidence of knowledge of falsity or reckless disregard of truth and not simply on ill will alone; that it is no answer that the jury was properly told in other instructions that actual malice meant publishing with knowledge of falsity or in reckless disregard of the truth.

These issues are not before the Court because they were not raised in the trial court. *Pittman-Rice Coal Co.* v. *Hansen* (1947), 117 Ind. App. 508, 72 N. E. 2d 364.

> "Because petitioner failed to object to this erroneous interpretation of *New York Times* at trial, and in fact offered instructions which were themselves inadequate, the issue of these instructions is not before us." *Beckley Newspapers Corp.* v. *Hanks, supra,* at p. 82.

We do not review issues presented for the first time on appeal except to avoid grave injustice. *Widmer* v. *Sweeney* (1955), 234 Ind. 263, 124 N. E. 2d 385. We see no such problem here.

(C) Appellant says the trial court erred in giving instruction No. 28, which reads in part as follows:

> "Plaintiff has the burden of proving,
>
> "First that the publications accused plaintiff of the crimes he alleges, to-wit:
>
> "1. Accessory after the fact of murder in connection with two separate incidents.

"2.   Malicious prosecution of one man for murder and another for accepting a bribe.

"3.   Intimidation of witnesses in connection with two separate incidents.

"4.   Aggravated assault and battery in connection with four separate incidents.

"5.   Assault and battery with intent to kill in connection with four separate incidents.

"In resolving this issue it is not necessary that plaintiff be so charged by the article in question in that precise language required in a criminal indictment or affidavit. Each article must be judged when read as a whole by the ordinary reader, taking into account the headlines, emphasis and any light cast upon it by preceding publications if shown by the evidence."

Appellant objected to the last paragraph as follows:

"For the additional reason that there is no evidence that any reader read all of such articles, except evidence entered over objection, or on rebuttal."

The instruction is adequate and this issue is disposed of by the above discussion in Section I (A) concerning the sufficiency of the evidence to show that the publications accused appellee personally of the crimes alleged.

The rest of the instruction is as follows:

"SECOND: That the accusations were false.

"THIRD: That defendant knew said accusations were false or published them with a reckless disregard of truth.

"In resolving the last two issues the evidence tending to prove falsity may not necessarily tend to prove knowledge or reckless disregard. Only that evidence tending to prove falsity of which defendant was aware should be considered upon the issue of defendant's knowledge of falsity or reckless disregard of truth."

Appellant objected to this portion of the instruction as follows:

"The defendants further object to Instruction No. 6 for the reason that the instruction fails to tell the Jury that in this case, where the plaintiff has not based its complaint

or defamation on statements contained in the publication, but has elected to base his claim on the ground of certain meanings or innuendos charging him with crime, the burden, the defendants assert, is on the plaintiff to prove that (1) the accusations of crime are implied by statements contained in the publications; that those statements themselves were published with knowledge of falsity or with reckless disregard of the truth or falsity, and that the accusations themselves were false and were known to be false, or probably false, at the time of the publication in question."

However, on appeal appellant's argument is entirely devoted to showing that this instruction is inconsistent with other instructions given. This was not the basis of the objection in the trial court and it cannot be raised for the first time on appeal. *Pittman-Rice Coal Co.* v. *Hansen, supra; Widmer v. Sweeney, supra.* We believe the instruction is adequate and does exactly what appellant's objection demands.

(D) Appellant says the trial court erred in giving instruction No. 24, which reads as follows:

"Reckless disregard of truth describes the state of mind of one who *publishes an untruth with such knowledge of existing facts and circumstances refuting such untruth,* as to evince an abandonment of any care for the rights of others and a heedless indifference to the wrongful injury which is likely to result from such publication." (Emphasis added.)

and in giving instruction No. 26, which reads as follows:

"In resolving the issue of reckless disregard of the truth, as same is applicable to their cause, you may give due consideration to the facts you find the defendant knew at the time of any such publication together with all other circumstances such as the reliability or lack of reliability of its informants the sources of additional information available to defendant and known, by it, to be available."

and in refusing appellant's tendered instruction No. 9, which reads as follows:

"In determining whether defendants published any accusation or statement concerning the plaintiff with reckless disregard of whether it was false or not, I instruct you that defendants had no duty to check the accuracy or truthfulness of any accusation or statement before publishing it, whether it was made by a third person or by defendants. The fact, if you find it to be a fact, that defendants may have failed to make some investigation or check some record which plaintiff feels should have been made or checked before publishing such an accusation or statement is completely irrelevant. The question is not whether defendants were negligent or reckless in failing to check the accuracy of what they published. The question is—did defendants at the time have actual knowledge that what they were publishing was false or so probably false that such publishing constituted reckless disregard of their own knowledge concerning the truth."

Appellant's argument is that the jury was erroneously told that the standard by which they were to determine the question of reckless disregard was the negligence standard of whether appellant failed to exercise care to learn facts which were available to it had it conducted an investigation. Appellant cites the *St. Amant* case to the effect that:

"reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication. 390 U. S. at 731.

Clearly, No. 24 does not suffer from this defect. It tells the jury that appellant's knowledge must be of such facts and circumstances existing at the time of publication which refute the falsehood. This seems a legitimate paraphrase of the legal test set out in the last sentence of appellant's tendered instruction No. 9. The last portion of No. 24 does not detract from the first part and does not make due care the standard for determining whether appellant published the articles with actual malice. It merely elaborates on the state of mind of one who knowingly or recklessly publishes a defamatory falsehood.

We believe No. 26 was a proper instruction. We agree with the rule in the *St. Amant* case that to find reckless disregard to evidence must "permit the conclusion that appellant in fact entertained serious doubts as to the truth of the publication." However, this does not tell us what *kind* of evidence may be used to reach that conclusion. Whether appellant in fact entertained such doubts may be proved by circumstantial evidence just as the state of mind of persons in other types of cases may be proved by circumstantial evidence. As was also stated in *St. Amant:*

> "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he publish with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U. S. at 732.

We believe that evidence which permits the vital conclusion includes, besides ill will evidence, evidence of the obvious lack of reliability of appellant's sources of information, and evidence of appellant's information as to additional sources available to it. In *Goldwater* v. *Ginsburg* (2d. Cir., 1969), 414 F. 2d 324, the court stated:

> "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his reports. *St. Amant* v. *Thompson, supra,* at 732, 88 S. Ct. 1323.
>
> \* \* \*
>
> "As already stated, *supra*, [New York] Times does not hold that evidence of negligence is inadmissible; it only

holds that evidence which merely establishes negligence in failing to discover misstatements, without more, is constitutionally insufficient to support the finding of recklessness required to establish actual malice from proof of less than prudent conduct. . . . To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness. It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See *St. Amant* v. *Thompson*." 414 F. 2d at 337, 343.

*All* the evidence must permit the conclusion that the appellant in fact entertained serious doubts as to the truth of the publication.

Appellant's tendered instruction No. 9 is erroneous and was properly refused. The fact that appellant recklessly failed to check a known source may be evidence that it entertained serious doubts as to the truth of the publication. The trial court instructions do not establish a standard of reasonable care or due care as to the publication of the defamatory falsehoods. The legal definition of "reckless disregard" was given to the jury in several instructions and we see no error here.

## IV.

Appellant argues that the trial court erred in admitting several different items of evidence which were incompetent because they were hearsay.

(A)   Appellant contends the trial court erred in permitting appellee to read into evidence certain portions of Deputy Cottey's deposition. The introduction of this evidence came about in this way. During cross-examination by appellant, appellee was questioned about certain statements made by Cottey in his deposition. Appellee objected arguing that Cottey was under subpoena by appellant and available to testify. The objection was overruled and appellee answered the questions. Then on re-direct appellee read into evidence

*other* portions of Cottey's deposition. Appellant objected to that pointing out that Cottey was also under subpoena by appellee and that appellant had not had anyone *read* from Cottey's deposition. That objection was also overruled and it is this ruling that appellant contends was erroneous. This ruling was, of course, proper since *appellant* had opened the door by asking appellee about certain of Cottey's answers on his deposition leaving a misleading impression, and appellee was therefore entitled to read other portions of that deposition. *Appellant* then put into evidence still other portions of Cottey's deposition. Clearly there is no reversible error here.

(B) Appellant argues that appellee's, Deputy Mellene's and Deputy Robert Atwell's statements concerning the questioning of McAdams on October 26th, constituted hearsay and were inadmissible. These statements were to the effect that McAdams went willingly to the jail to see appellee, that he voluntarily repudiated his story about a deputy beating Reagan, and that Rick Johnson had it in for appellee.

Hearsay evidence has been defined as follows:

> "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.
>
> "What strikes one's attention at once about this definition is that it fixes a stringent condition on the popular notion of hearsay as being merely what a witness says he heard someone else say. In truth, that popular notion is quite inadequate as a definition of what is excluded by the hearsay rule." McCormick, Evidence, § 225 (1954).

See also 5 Wigmore, Evidence §§ 1361, 1362, (3d ed., 1940); *Wayne Works* v. *Hicks Body Co.* (1944), 115 Ind. App. 10, 55 N. E. 2d 382.

If the questioned evidence is hearsay and does not fall within one of the exceptions to the rule, then it is inadmissible in evidence. *Compton* v. *Fleming* (1846), 8 Blackf. 153. The question for this Court then would be whether the erroneous

admission of such evidence was harmless error. However, the evidence is inadmissible only if it is really hearsay evidence. Not all testimony about the extra-judicial utterances of a third person made outside the presence of the parties qualifies as hearsay evidence. It depends on the *purpose* for which it is offered.

> "The hearsay rule forbids evidence of assertions to prove the facts asserted in them. Manifestly, proof of utterances and writings may be made with an almost infinite variety of other purposes, not resting for their value upon the veracity of the out-of-court declarant and hence falling outside the hearsay classification." McCormick, Evidence, § 228 (1954).

Professor Wigmore says:

> "The true nature of the Hearsay rule is nowhere better illustrated and emphasized than in those cases which fall without the scope of its prohibition. The essence of the Hearsay rule is the distinction between the testimonial (or assertive) use of human utterances and their non-testimonial use.
>
> "The theory of the Hearsay rule (*ante,* § 1361) is that, when a human utterance is offered as evidence of the truth of the fact asserted in it, the credit of the assertor becomes the basis of our inference, and therefore the assertion can be received only when made upon the stand, subject to the test of cross-examination. If, therefore, an extra-judicial utterance is offered, not as an assertion to evidence the matter asserted, *but without reference to the truth of the matter asserted,* the Hearsay rule does not apply. The utterance is then merely not obnoxious to that rule. It may or may not be received, according as it has any relevancy in the case; but if it is not received, this is in no way due to the Hearsay rule.
>
> \* \* \*
>
> "The prohibition of the Hearsay rule, then, *does not apply to all words or utterances merely as such.* If this fundamental principle is clearly realized, its application is a comparatively simple matter. The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely, *as assertions to evidence the truth of the matter asserted.*" 6 Wigmore, Evidence, § 1766 (3d ed. 1940).

So in this case, if the questioned utterances by third parties which are in the form of assertions, not made under oath or subject to cross-examination by appellant, are offered to prove the *fact* of the utterance and *not* offered to prove the truth of the facts asserted, then there is no hearsay problem. It is not even a case of being an exception to the hearsay rule, which would imply it was hearsay. It is not hearsay at all.

A corollary of this rule is that only utterances capable of being true or false can possibly fall within the classification of hearsay. True requests, commands, and questions are not assertions and a witness may testify concerning a third party's making such utterances because they are not offered for the truth of the facts asserted.

With these principles in mind we turn to the alleged error.

There was sufficient evidence to support the jury finding that the appellant impliedly accused appellee and his deputies of the crime of intimidating McAdams, a Grand Jury witness, into repudiating his story by twice interviewing McAdams on that date at the jail. Thus, appellant attempted to give legal significance to appellee's and the deputies' actions. An intimidation of a person is a more subtle thing than use of force, and must be determined from the context and the words used by both parties. The utterances of McAdams were not offered for their truth but for the fact that they were made. They were admissible as the "verbal part of an act". Wigmore defines this as follows:

> "A second kind of situation in which utterances are not offered testimonially arises when the utterance *accompanies conduct to which it is desired to attach some legal effect.* The conduct or act has intrinsically no definite significance, or only an ambiguous one, and its whole legal purport or tenor is to be more precisely ascertained by considering the words accompanying it. The utterance thus enters merely as a verbal part of the act, or, in the common phrase, a 'verbal act.'
>
> "Perhaps most of our acts to which legal effect is to be attached in creating, transferring, modifying, or extinguishing rights, consist in part of words. . . . Without the words,

the act as a whole may be incomplete; and, until the words are taken into consideration, the desired significance cannot be attributed to the wordless conduct.

"Thus the words are used in no sense testimonially, *i.e.* as assertions to evidence the truth of a fact asserted in them. On the one hand, therefore, the Hearsay rule interposes no objection to the use of such utterances, because they are not offered as assertions (*ante,* § 1766). On the other hand, so far as they may contain assertions, these are not to be used or argued about testimonially, nor believed by the jury; for this would be to use them in violation of the Hearsay rule. In short, the utterances enter *irrespective of the truth of any assertion they may contain;* and they neither profit nor suffer by virtue thereof.

"These considerations point out the four simple limitations which attend this use of utterances as verbal acts; namely:

"(1)   The conduct to be characterized by the words must be *independently material to the issue;*

"(2)   The conduct must be *equivocal;*

"(3)   The words must aid in *giving legal significance to the conduct:*

"(4)   The words must *accompany the conduct.*" 6 Wigmore, Evidence, § 1772 (3d ed. 1940).

See also McCormick, Evidence, *supra.*

The conduct involved here was independently material to the issue of the falsity of appellant's accusation against appellee that appellee intimidated a Grand Jury witness. The conduct by itself was equivocal. The deputies asked McAdams to go to the jail and be interviewed and he was permitted to drive his own car. He repudiated his story and he left. Was he intimidated through fear to rescind a true story or did he merely repudiate a lie? The words are of vital importance in determining that issue and given legal significance to the conduct. The words obviously accompanied the conduct. All four of Wigmore's tests are satisfied in this case.

Appellee's and his deputies' testimony concerning McAdams' statements are also admissible as circumstantial evidence of McAdams' state of mind at the time, namely, whether he was in a state of fear. On this point Wigmore says:

"The condition of a speaker's mind, as to knowledge, belief, rationality, emotion, or the like, may be evidenced by his utterances, either used testimonially as assertions to be believed, or used circumstantially as affording indirect inferences. . . . The usual resort is to utterances which circumstantially indicate a specific state of mind causing them.

"To such a use, then, the Hearsay rule makes no opposition, because the utterance is not used for the sake of inducing belief in any assertion it may contain. The assertion, if in form there is one, is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in the law, is easy to be ignored, and it needs perhaps to be emphasized." 6 Wigmore, Evidence, § 1790 (3d ed. 1940).

See also McCormick, Evidence, *supra*.

It is not decisive that the statements could also have a testimonial use.

"Here, then, J. S.'s utterance has two possible uses,—its testimonial and its circumstantial use; so far as the former is concerned, the Hearsay rule applies, but to the latter the Hearsay rule has no application. Again, in evidencing sanity or insanity, a testator's statement, 'I am the King of Dahomey', or 'I have a million dollars in the bank', may be treated either testimonially or circumstantially; so far as it is offered circumstantially, as indicating a delusion in the testator's mind, it is not obnoxious to the Hearsay rule. It is immaterial whether or not, in the case in hand, the assertive or testimonial use might be improperly made by the jury; the judge's instructions are the corrective against this. On the principle of Multiple Admissibility (*ante*, § 13), if there is *any* relevant circumstantial use, the utterance is admissible for that purpose." 6 Wigmore, Evidence, § 1790 (3d ed. 1940).

See also McCormick, *supra*.

What McAdams said, treated as a factual occurrence which was circumstantial evidence of his state of mind was relevant to the charge of intimidation against appellee, and appellee and the deputies were eye-witnesses to that occurrence. Appellee and the deputies had a perfect right to describe what they did, said, saw and heard during the interview with

McAdams in order to refute the charge of intimidation. There is no hearsay problem here because McAdams' statments were not offered for the truth of the facts they asserted.

If any items of evidence were relevant and admissible for one purpose and not for another, there was no error in their admission. In *State* v. *Vaughn* (1962), 243 Ind. 221, 184 N. E. 2d 143, we held:

> "The evidence admitted was not objectionable for the reason stated. It is not error to admit evidence if it is relevant material and competent for any use. If the use for which the evidence is admissible is limited, the burden is on the opposing party to ascertain that the evidence is considered by the trier of the facts for such limited purpose only." 243 Ind. at 227.

See also 6 Wigmore, Evidence, *supra.*

Appellant did not request such an instruction in this case.

(C)   Another item of evidence that appellant claims was inadmissible hearsay was Deputy Cottey's affidavit.

This affidavit was not offered for the truth of the assertions therein but as circumstantial evidence to refute appellant's repeated claim that appellee did not investigate the charge of jail irregularities. (See discussion above in B) The fact that the affidavit was taken several months after the beating on July 14th is not relevant. When Cottey left on vacation on Oct. 20, appellee did not even know of Cottey's alleged involvement in the case. While on vacation Cottey became ill and did not return to work for some time, the exact date not being clear to us. The lapse of time between his availability to be interviewed and the taking of the affidavit might have diminished the *relevance* of the affidavit but it could not convert it into hearsay. It was not objected to as being irrelevant, nor was a limiting instruction sought by appellant. *State* v. *Vaughn, supra.*

In any event the evidence in this affidavit was the same as that presented through appellee's reading of certain portions

of Cottey's deposition and was therefore merely cumulative. Even *if* it was erroneously admitted it was harmless error. *Bankers Surety Co.* v. *German Investment & Securities Co.* (1920), 189 Ind. 311, 126 N. E. 6.

(D) Appellant claims another example of inadmissible hearsay was plaintiff's Exhibit 237 T, a transcript of McAdams' guilty plea on August 26, 1965, where McAdams, after he supposedly witnessed the beating of Reagan, requested to serve his time in the Marion County Jail. This is not an example of hearsay. McAdams' *request* for something is not a declaration or assertion which can be true or false. It cannot be offered for the truth of what it asserts because it asserts nothing, nor attempts to. It is a different type of utterance altogether. The fact that McAdams made such a request is admissible to show McAdams' state of mind at that hearing and that he had no fear of being in the Marion County Jail. (See the discussion above under B)

(E) Appellant claims plaintiff's Exhibit 282 A, a letter from appellee to the Superintendent of General Hospital, dated March 25, 1964, was inadmissible hearsay.

One of the main charges appellant made in its series of articles was the existence of brutality and neglect of sick prisoners in the jail supervised by appellee. Appellee introduced the exhibit as an *act* which showed his concern for such prisoners. The letter was not hearsay because it was not offered for the truth of the assertion made therein, but for the fact that it was written at all. (See discussion above in B)

Even if it were inadmissible, this letter merely discussed the problems of medical attention for the prisoners and we fail to see how it could conceivably constitute reversible error.

We repeat that this trial lasted from April 18th, until June 14, 1967. There were ninety-six (96) witnesses and the trial court admitted six hundred sixty-four (664) separate items of

evidence. We believe the trial court did a good job of dealing with this avalanche of evidence and do not see how this letter could have made any difference either way.

(F) Appellant contends that it was error to admit the testimony of appellee as to what his former law partner Ed Lewis had told him that appellant's reporter Rick Johnson had said in a conversation between Lewis and Johnson at which appellee was not present.

Both Lewis and Johnson testified to that same conversation. Appellant does not point out how appellee's testifying to that conversation could be prejudicial to appellant; nor does appellant set out what appellant's testimony even was on this point. The trial court committed no error here.

Appellant implies that there are many more examples of erroneous admissions of hearsay evidence, however, it does not argue them and they are not before us on this appeal.

I vote to affirm this judgment. Jackson, J., is of the opinion that the judgment of the trial court should be affirmed and concurs in this opinion.

## APPENDIX

### *Chronology*

| | |
|---|---|
| July 14, 1965 | —Beating of Reagan by William Brown, a fellow prisoner; admitted to hospital 5:09 p.m. |
| August 5, 1965 | —Charges against Reagan dismissed. |
| August 7, 1965 | —Death of Reagan. |
| August 8, 1965 | —Autopsy on Reagan. |
| August 10, 1965 | —Indianapolis Times story that fight injuries caused death of Reagan. |

| | |
|---|---|
| August 11, 1965 | —Preliminary autopsy report; Appellant's reporter, Rick Johnson, inquired at jail about Reagan case; Deputy Haine, who had been assigned investigation of Reagan case was fired for accepting a bribe. |
| August 12, 1965 | —Sgt. Mellene takes over Reagan case; Times reported Brown in hospital; Indianapolis Star claimed it had bared the Reagan beating |
| August 13, 1965 | —Sheriff filed charges against Brown. |
| August 26, 1965 | —McAdams plead guilty to theft and was sentenced to six months imprisonment; McAdams ask to go to county jail. |
| October 18, 1965 | —Start of Haine Merit Board Hearing. |
| October 20, 1965 | —Close of Haine Hearing and he was found guilty and fired. |
| October 21, 1965 | —Rick Johnson first met McAdams and took him to Judge Fife to give a statement. |
| October 22, 1965 | —McAdams signed an unsworn statement in presence of Judge Fife and the Coroner. |
| October 25, 1965 | —Fife amended McAdams' commitment to time served and McAdams was released. |
| October 26, 1965 | —McAdams questioned by Grand Jury and by appellee; McAdams repudiated his story. |
| October 27, 1965 | —Series upon which appellee's complaint was based was started; Exhibit 1. |
| October 28, 1965 | —McAdams repudiates his story in open court before Judge Fife; Fife sent McAdams back to jail; McAdams testified again before the Grand Jury. |

November 5, 1965 —Rick Johnson obtained information that hospital records showed Reagan admitted at 5:09 p.m. July 14th; inconsistent with McAdams' story.

November 6, 1965 —Appellant's editors were informed of contradiction of McAdams' statement.

November 7, 1965 —Appellee's first recovery paragraph, complaint paragraph No. 12.

November 8, 1965 —Appellee served first notice to retract on corporate appellant; refused.

November 9, 1965 —Appellee's second recovery paragraph, complaint paragraph No. 14.

November 12, 1965—Appellee filed suit alleging meanings specified in November 8th notice.

November 13, 1965—Appellee's third recovery paragraph, complaint paragraph No. 18.

November 15, 1965—Appellee's fourth recovery paragraph, complaint paragraph No. 20.

November 23, 1965—Grand Jury report said McAdams' story false and returned indictment of Brown for Second Degree Murder; exonerated Sheriff's Dept. of charges of brutality.

December 3, 1965 —Appellee's fifth recovery paragraph, complaint paragraph No. 37.

December 18, 1965—Appellee's last recovery paragraph, complaint paragraph No. 40.

January 5, 1966 —Notice to retract in form of unfiled complaint.

January 10, 1966 —Complaint filed.

March 24, 1966 —Jury in Brown case found that Brown attacked Reagan but was not guilty by reason of insanity.

*Exhibit 2, p. 1:*

## "BEATING WITNESS VANISHES"

"The key witness in the investigation of the fatal beating of a Marion County Jail inmate disappeared suddenly yesterday after he was seized twice by Sheriff's deputies and interrogated by Sheriff Robert H. Fields."

"Fields said he received a repudiation of the missing man's signed statement that a jail deputy was responsible for the beating, after his deputies grabbed the man and brought him to the sheriff's department before and after he testified before the Grand Jury."

"The witness, Charles McAdams, 35 years old, said, however, after the meetings in the sheriff's office that he gave no statement."

"McAdams charged in the notarized statement Tuesday that the beating victim, Elmer L. Reagan, 50 years old, who died Aug. 7, had been attacked several times by the deputy, although the beating which led to his death by pneumonia had been blamed on a mental patient."

"REAGAN WAS beaten July 14, according to the prisoner, and the mental patient, William A. Brown, was arrested on a second-degree murder charge after sheriff's investigators stated Brown beat Reagan when they were locked in the same cell."

"McAdams was picked up by sheriff's investigators Tuesday before and after he testified before the grand jury, and released after the Indianapolis Star learned he was being held."

"He later told The Star deputies stopped him at 4 p.m. and threatened to arrest him if he refused to accompany them downtown. He said he was allowed to drive his own car while deputies followed."

" 'They hammered me hard with questions for about an hour and then took me over to the grand jury and I testified,' he said. 'When I walked out Deputy Jim Mellene took me back to the jail and I had a long talk with the sheriff and then they took me back and questioned me some more.' "

"He said he was 'scared to death and nearly sick' and before he was released 'one of the deputies pulled a bottle of whiskey out of a drawer and said I could have it.' "

"It was during the interrogation that McAdams repudiated his statement, Fields said."

"McAdams agreed to meet with Pearcy yesterday to take a polygraph (lie detector) test but failed to appear and could not be located."

\* \* \*

*Exhibit 2, p. 3:*

## "LET'S HAVE ANSWERS, ACTION!"

"Nothing but the truth can chase away the giant question mark that hangs today over the Marion County Sheriff's Department—or turn it into a blistering and scandalous indictment.

"Allegations of murder in the jail, a beating by a sadistic deputy, a frame-up of an innocent man and attempts to intimidate a grand jury witness all add up to the ugliest compound of accusations to be made in a sorry chapter of the department's history.

"Suspicion is unavoidable. These charges made by a former prisoner climax a series of irregularities which the sheriff's office has covered up. The past irregularities were brought to light only after long, hard digging by The Star.

"The newest allegations add up to a sinister story.

They were made by a former jail inmate who testified Tuesday before the Marion County Grand Jury. He said that a deputy sheriff kicked and beat Elmer L. Reagan, a 50-year-old inmate being held in jail on a drunkenness charge, on July 14. By the witness's account, the attack was vicious and sadistic. He said the deputy became enraged when Reagan called him a name after asking for medicine."

"Reagan was taken from the jail to Marion County General Hospital with 12 broken ribs and internal injuries. He died Aug. 7 as a result of pneumonia caused by the injuries, the coroner's office reported.

"Both the fact that he had been beaten and that he had died were conveniently ignored by the sheriff's office. Only after The Star, upon receiving a tip, investigated, were these facts brought to light.

"Then the sheriff's office came up with the first version of the case, claiming Reagan had been locked in a cell with a 24-year-old mental patient, who had inflicted the fatal beating. This procedure—confining two such inmates in the same cell—in itself seemed highly irregular, as we commented at the time. A sheriff's investigator then charged the mental patient with Reagan's murder, and the charge is still pending.

"Now the most serious doubt is cast upon this version of the fatal beating.

"An 11-week investigation by Star Reporter Rick Johnson, based upon a tip from the former prisoner who said he knew what really had happened, led to the ex-inmate's appearance before the grand jury.

"The witness later made another potentially damning accusation, claiming that sheriff's deputies had tried to intimidate him both before and after his grand jury appearance.

"This specific charge deserves stern investigation, as to its truth or falsity, for it brings up this question: If the deputies did try to intimidate him, does this not lend credence to the witness's story of the beating?

"Now Sheriff Robert H. Fields says he has obtained a 'repudiation' of the witness's original account of the fatal attack on Reagan. How did he get it? What were the circumstances under which it was obtained? What would induce the witness to change his story?

"Only a thorough, incisive investigation is going to answer the questions that must be answered.

"Prosecutor Noble F. Pearcy has said that subpenas will be issued for all persons, including four deputies and several prisoners, named in the witness's statement. Some of these witnesses are out of town and it may be a matter of days before they can be brought here to testify.

"Meanwhile, Sheriff Fields should waste no time in taking steps to improve jail internal security so that sordid and ugly episodes such as the Reagan beating are impossible. This may require personnel or technical changes or both. But they should be made at once.

"As for the investigation of the witness's charges, Indianapolis and Marion County are waiting for the answers. And the community will settle for nothing less than the truth."

*Exhibit 3, p. 2:*

"SOME MORE QUESTIONS"

"It seems odd to us that Prosecutor Noble Pearcy should see nothing wrong in the fact that deputies from the sheriff's office and the sheriff himself should call a chief witness, who had appeared before the grand jury for interrogation, and get a retraction of his grand jury testimony from him.

"After all, it is the sheriff's office that is accused of wrongdoing. If every accused wrongdoer had the opportunity to interrogate his accuser as was done in this case, you sure wouldn't have many willing grand jury witnesses for any case. It is, to say the least, irregular to permit the accused to cross examine the accuser outside of the court particularly when he has the power of the sheriff's office behind him.

"Another question: If the sheriff and his deputies had nothing to fear from a grand jury investigation, if they know that they are in the clear on the charges against them, why did they not just let the investigation proceed and clear them of the charges? Why did they grab the witness and haul him down to the jail which led to his changing his story? If it is untrue, could they not prove it by the facts and records already in existence?

"It makes you wonder, doesn't it?"

*Exhibit 7, p.1:*

"Protection for witnesses who testify before the Marion County Grand Jury in the steamrolling investigation of brutality at the Marion County Jail was promised by a second Criminal Court judge yesterday."

"Judge Saul I. Rabb of Criminal Court, Division 2, joined Judge Eugene M. Fife, Jr. of Division 1 in offering protection for jury witnesses."

"Rabb and Fife said all persons who testify would become 'continuing witnesses' and thereby placed under the protection of both criminal courts and the grand jury."

"Fife ordered last week that jury witnesses were not to be bothered or questioned before or after their testimony, and questioning of any witnesses by sheriff's personnel was to be done in his presence."

"Rabb concurred with Fife and added that questioning of witnesses outside the jury room would take place only while he was present or in the presence of his court reporter."

"Persons found guilty of tampering or intimidating witnesses or impeding justice could be fined from $10 to $500 and jailed from 10 to 60 days if convicted."

"The stepped-up protection for witnesses came after Sheriff Robert H. Fields and deputies seized one witness last week and questioned him before and after he appeared before the grand jury."

"The witness, Charles P. McAdams, 35 years old, had signed a notarized statement accusing a sheriff's sergeant of the fatal beating of an inmate, but, according to Fields, repudiated the statement during the questioning by Fields and deputies."

*Exhibit 11, p. 1:*

"EX-CELLMATE BACKS BEATING REPORT"

"SUPPORTS McADAMS' 1st STORY"

*Exhibit 12, p. 1:*

"Comparison of a Marion County Sheriff's Department report on the death of a jail inmate and hospital records has posed a puzzle for the grand jury probing brutality at the jail."

"Spotlighted is one big question: How could a mental patient, shackled to bars, inflict mortal injuries on another prisoner?"

"Elmer L. Reagan died Aug. 7 of pneumonia, induced by a severe beating, after being admitted to Marion County General Hospital, July 14."

"The mental patient, William A. Brown, was charged with second degree murder."

"BROWN WAS admitted to Marion County General Hospital on Aug. 2 and records there show conclusively that his arms and legs bore distinct marks of shackles and handcuffs, according to investigators. It was evident he had been in constant restraint for some time, they said."

\* \* \*

*Exhibit 12, p. 2:*

"But the pitiful—and portentous—death Aug. 7 of the jail inmate, Elmer L. Reagan, 50 years old, was unreported until The Indianapolis Star learned of it five days later. Cause of his death was pneumonia, brought on by the smashing of his ribs."

"A mental patient chained in the same cell which Reagan had occupied was charged with second-degree murder in the beating which supposedly led to the victim's death."

"The grand jury was given the case against the mental patient, William A. Brown."

"AND THAT was that.

But on Oct. 25, Charles P. McAdams, 35, a barber in jail on a charge of stealing barbering shears at the time Reagan was jailed, charged in a notarized statement that Reagan actually was attacked July 14 by an angry deputy sheriff."

"After McAdams' charge was brought to light by The Star, the jury's investigation into Reagan's death suddenly broadened."

"McADAMS testified Oct. 26 before the grand jury. Sheriff's deputies took him in custody twice that day—before and after his jury appearance. He reported that deputies sought a statement from him and he refused to give it."

"Then he disappeared.

The following day, Sheriff Robert H. Fields, under whose jurisdiction the jail is run, declared the missing man had repudiated his statement."

"But a day later, on Oct. 28, the girl friend of McAdams declared that McAdams, who had told her of Reagan's beating, was 'brainwashed' by the deputies who gave him whisky."

" 'He sold out,' declared Mrs. Lura Kimbley, 52, Danville, Ill. 'He sold out,' she repeated."

"Later, she told Judge Eugene M. Fife, Jr., of Criminal Court, Division 1, that she was sure McAdams told the truth in his original statement. A parolee also came forward to say he heard McAdams discussing the death in the jail."

"Friday, a former jail cellmate of McAdams added further corroboration to McAdams' original statement. He said McAdams told him of witnessing the beating of Reagan."

NOTE.—Reported in 259 N. E. 2d 651.